

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

*Michelle V. Larson*

_____

**Signed August 10, 2022**

**United States Bankruptcy Judge**

_____

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| **JAMES BRADLEY LAGER**, *et al.*,[1] | ) | Case No. 22-30072-MVL-11 |
| | ) | |
| Debtors. | ) | |
| | ) | |
| **PIRTEK USA, LLC**, | ) | Adv. No. 22-03042-MVL |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **JAMES BRADLEY LAGER & JBL HOSE** | ) | |
| **SERVICE LLC dba TEXAS HOSE PRO,** | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

_____

[1] This case is being jointly administered with *In re JBL Hose Service, LLC*, Case No. 22-30439 pursuant to this Court's order entered on March 14, 2022. Case No. 22-30072 (hereinafter the "**Main Case**"), ECF No. 54.

## MEMORANDUM OPINION AND ORDER
## DENYING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT

Before this Court is the Motion to Dismiss Plaintiff's Complaint Pursuant to Fed. R. Civ. P. 9(b) and 12(b), Made Applicable by Fed. R. Bankr. P. 7009 and 7012 (the "**Motion**") filed on May 31, 2022 by the Defendant-Debtors James Bradley Lager and JBL Hose Service LLC (each a "**Defendant**" or "**Debtor**" and, collectively, the "**Defendants**" or "**Debtors**").[2] Through the Motion, the Debtors seek dismissal of the Complaint for Damages, Injunctive Relief and for Non-Dischargeability of Debt (the "**Complaint**") filed by the Plaintiff PIRTEK USA, LLC (the "**Plaintiff**") on May 25, 2022.[3] The Plaintiff recites four causes of action in the Complaint: (I) Breach of Second Settlement (Non-Disparagement Clause); (II) Breach of Second Settlement (Confidentiality Agreement); (III) Objection to Dischargeability of Debt Pursuant to 11 U.S.C. § 523(a)(6) (as to James Bradley Lager); and (IV) Objection to Dischargeability of Debt Pursuant to 11 U.S.C. § 523(a)(2)(A) (as to James Bradley Lager).

On June 21, 2022, the Plaintiff filed its Brief in Opposition to the Motion (the "**Response**").[4] On July 1, 2022, the Debtors filed their Reply to the Response (the "**Reply**").[5] The Court held a hearing on the Motion on July 6, 2022. At the conclusion of the hearing, the Court took the matter under advisement to better analyze the plethora of legal issues raised in the Parties' briefing and argument. Thereafter, on July 18, 2022, the Plaintiff filed its Notice of Supplemental authority in Response to Court Question at July 6 Hearing (the "**Surreply**").[6]

---

[2] ECF No. 18.
[3] ECF No. 14.
[4] ECF No. 20.
[5] ECF No. 21.
[6] ECF No. 23. The Court is inclined to note that, in the Fifth Circuit, surreplies are disfavored absent extraordinary circumstances justifying their filing, as surreplies are often used by nonmovants in an attempt to snatch the last word on an issue from the movant. *Warrior Energy Servs. Corp. v. ATP Titan M/V*, 551 Fed. App'x 749, 751 n.2 (5th Cir. 2014); *Lacher v. West*, 147 F. Supp. 538, 539 (N.D. Tex. 2001). Although the Surreply here was not filed with this

Upon careful consideration of the briefing and arguments of counsel at the hearing, the Court will hereby **DENY** the Motion as more fully explained below.

## I.     Jurisdiction and Venue

This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) and the matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(B).  Venue is proper in this district pursuant to 28 U.S.C. § 1409(a).

## II.     Factual Background

The Plaintiff alleges the following facts, among others, in the Complaint:

### A.     The First Settlement

The Plaintiff granted the Debtors their first PIRTEK store in Dallas, Texas pursuant to a franchise agreement signed on May 3, 2010, and their second location in Fort Worth, Texas on November 12, 2012, pursuant to a second franchise agreement (each a "**Franchise Agreement**" and, collectively, the "**Franchise Agreements**").  Eventually, the parties' business relationship soured.  In 2016, the Debtors' business succumbed to financial difficulties and defaulted on a $70,000 loan to another creditor.  By 2018, the Debtors' sales had fallen significantly, and the Debtor fell out of compliance with the Franchise Agreements.  The Plaintiff declined to renew the Franchise Agreement for the Debtors' Dallas location and notified the Debtors of the same on November 18, 2019.

To avoid litigation, the parties finalized a settlement agreement in January 2020 (the "**First Settlement**").  The First Settlement provided for the termination of both Franchise Agreements. In exchange, the Plaintiff agreed to waive the non-compete clauses contained in the Settlement

---

Court's express leave, the Court understands that it was filed in response to the Court's questioning as to the existence of authority during the hearing, and thus is less of an attempt to sneak in the last word over the Debtors.  Moreover, the Debtors have not sought to have the Surreply stricken.  Thus, the Court will consider the authority raised by the Plaintiff in the Surreply.

Agreements, allowing the Debtors to continue to operate a competitive business. Furthermore, the Debtors agreed to pay certain sums of money to the Plaintiff and refrain from engaging in any disparaging conduct directed at the Plaintiff.

## B.    The Second Settlement

Approximately six months later, Mr. Lager contacted the Plaintiff regarding his intent to publish a book entitled "HOSED! A Franchise Insider's Expose by Former PIRTEK USA Franchisee Jim Lager," unless the Plaintiff agreed to pay him $9 million. Additionally, Mr. Lager alleged that the Plaintiff discriminated against him in terminating the Franchise Agreements because he was a white male in an interracial relationship.

Although the Plaintiff maintained that all of Mr. Lager's accusations were false, the Plaintiff and the Debtors agreed to a mediation of the disputes between them on August 21, 2020, to avoid litigation and any resulting bad publicity from the Debtors' allegations. Following that mediation, the Parties agreed to enter into a second settlement agreement on September 2, 2020 (the "**Second Settlement**").[7]   In negotiating the Second Settlement, the Plaintiff insisted on a thorough non-disparagement clause (the "**Non-Disparagement Clause**") that prohibited the Debtors from engaging in any disparaging communications regarding the Plaintiff.  The Non-Disparagement Clause specifically precluded Mr. Lager from disparagement through a website called "unhappyfranchisee.com."  Furthermore, the Second Settlement forbade Mr. Lager from discussing PIRTEK USA with anyone except in very limited circumstances and set forth an approval process whereby a mediator would evaluate any of Mr. Lager's proposed communications.  Finally, the Parties agreed to a confidentiality agreement (the "**NDA**") that forbade any Party from discussing the existence or the terms of the Second Settlement.   In

---

[7] Main Case, ECF No. 37-2.  The Court hereby takes judicial notice of the terms of the Second Settlement as filed under seal on the docket in the Main Case pursuant to Federal Rule of Evidence 201.

exchange for the Non-Disparagement Clause and the NDA, the Plaintiff agreed to pay Mr. Lager $300,000.00 and to waive $153,000.00 of past due franchise fees due to the Plaintiff pursuant to the First Settlement.

Mr. Lager complied with the Second Settlement for approximately 9 months. On June 19, 2021, Mr. Lager initiated what would be the first of many social media and internet posts directed at the Plaintiff. On LinkedIn, Mr. Lager indirectly accused the Plaintiff of racially discriminatory practices and discussed his former Franchise Agreements. In total, Mr. Lager took to the internet approximately 20 times between June 2021 and February 2022, including multiple posts by unhappyfranchisee.com about Mr. Lager's experience as a franchisee of the Plaintiff.

The parties entered into arbitration over Mr. Lager's alleged breaches of the Second Settlement on June 28, 2021. On January 17, 2022 (the **"Petition Date"**), Mr. Lager filed his Chapter 11 petition initiating the Main Case (as defined below). On January 18, 2022, approximately thirty minutes before the Parties' final arbitration hearing was scheduled to begin, Mr. Lager informed the arbitrator of his bankruptcy petition filing. Arbitration proceeded for JBL Hose Service LLC, however, that Debtor subsequently filed for bankruptcy six weeks later on March 10, 2022.

## III.   Discussion

### A.   Standard for Motion to Dismiss

The Debtors seek dismissal of the Complaint pursuant to Rules 9(b) and 12(b)(6). Rule 12(b)(6), made applicable to adversary proceedings pursuant to Bankruptcy Rule 7012(b), permits dismissal of a complaint if the plaintiff fails to state a claim upon which relief can be granted.[8] Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires a "short and plain

---

[8] Fed. R. Civ. P. 12(b)(6).

statement of the claim showing that the pleader is entitled to relief."[9]  Thus, to withstand a 12(b)(6)

motion, a complaint must contain sufficient facts to state a facially plausible claim to relief.[10]  This

plausibility requirement sits somewhere between possible and probable, and is satisfied where the

plaintiff's pleaded facts allow the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged.[11]  Conclusions, labels, and formulaic recitations of the elements of a

claim are insufficient to withstand a 12(b)(6) motion.

Where, as here, a complaint alleges fraud, Rule 9(b) upgrades the pleading standard,

requiring that the party asserting fraud state with particularity the circumstances constituting fraud

or mistake, though malice, intent, knowledge, and other conditions of a person's mind may be

alleged generally.[12]  Rule 9(b) typically requires the plaintiff to identify the "who, what, when,

where, and how" of the alleged fraud.[13]  With regard to fraudulent misrepresentations, Rule 9(b)

requires the plaintiff to allege "the particulars of time, place, and contents of the false

representations, as well as the identity of the person making the misrepresentation and what that

person obtained thereby."[14]

In reviewing the Complaint in light of the Motion, the court must accept all well-pleaded

facts as true and view them in the light most favorable to the Plaintiff.[15]  Generally, Rule 12(b)(6)

---

[9] Fed. R. Civ. P. 8(a)(2); *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).

[10] *Twombly*, 550 U.S. at 570.

[11] *Iqbal*, 556 U.S. at 678.

[12] Fed. R. Civ. P. 9(b).

[13] *Brown v. Douglas, et al. (In re Dual D Health Care Operations, Inc.)*, Adv. No. 20-04059, 2021 WL 3083344, at *5 (Bankr. N.D. Tex. July 21, 2021) (Morris, J.) (quoting *Kreway v. Countrywide Bank, FSB*, 647 Fed. App'x 437, 437–38 (5th Cir. 2016)).

[14] *Id.* (internal quotations and modifications omitted) (quoting *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994)).

[15] *Sonnier v. State Farm Mut. Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007); *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004).

motions are viewed with disfavor, and dismissal based thereon is rarely granted.[16] The Court's review of the Motion is limited to the Complaint and documents incorporated into it by reference and any matter of which a court may take judicial notice.[17]

**B.      Nondischargeability Pursuant to § 523(a)(2)(A)**

The Debtors first seek dismissal of the Plaintiff's Count III seeking a determination of nondischargeability pursuant to § 523(a)(2)(A) of the Bankruptcy Code. The Debtors argue in the Motion that: (1) the Complaint fails to specify a debt obtained by a representation made by Mr. Lager that was false or made with the intent and purpose to deceive the Plaintiff, (2) the Complaint fails to allege facts showing that Mr. Lager made a representation that he knew was false or that he made with the intent and purpose to deceive the Plaintiff or for the purpose of inducing the Plaintiff to part with money or property, and (3) the Complaint fails to plead that the Plaintiff relied, justifiably or actually, on any representation Mr. Lager made. Finally, the Debtors argue that the Plaintiff failed to meet the heightened pleading standard under Rule 9(b). For the reasons that follow, the Court is not persuaded that the Complaint, which recites a long and detailed factual narrative, has failed in any of the respects the Debtors urge in the Motion.

Section 523(a)(2)(A) provides that a Chapter 11 discharge does not discharge an individual from a debt for "money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."[18]   To prove that a debt is nondischargeable because it was obtained through a false representation, a plaintiff must show: (1)

---

[16] *Faulkner v. AimBank (In re Reagor-Dykes Motors)*, Adv. No. 20-05039, 2021 Bankr. LEXIS 800, at *3 (Bankr. N.D. Tex. Mar. 30, 2021) (Jones, J.) (quoting *Ins. Distrib. Consulting, LLC v. Freedom Equity Grp., LLC*, No. 20-cv-00096, 2020 U.S. Dist. LEXIS 180313, at *2 (S.D. Tex. Sept. 4, 2020)).

[17] *Id.* (citing *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019); *Lone Star Fund V (US), LP v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010)).

[18] 11 U.S.C. § 523(a)(2)(A).

the existence of a knowing and fraudulent falsehood, (2) describing past or current facts, (3) that was relied upon by the Plaintiff.[19]   Although commonly read to be interchangeable, false representations and false pretenses, as Chief Judge Stacey G. C. Jernigan highlighted in *In re Clem*, have been recognized as distinct.[20]   False pretenses have been interpreted to include written or oral misrepresentations, or conduct which creates or fosters in the creditor a false impression and can include conduct and material omissions.[21]   Additionally, false pretenses have also been defined as "any series of events, when considered collectively, that create a contrived and misleading understanding of a transaction, in which a creditor is wrongfully induced to extend money or property to the debtor."[22]   For purposes of § 523(a)(2)(A), to prove actual fraud a plaintiff must prove that: (1) the Debtor made a representation; (2) the Debtor knew that the representation was false at the time it was made; (3) the Debtor made the representation with the intent and purpose to deceive the Plaintiff; (4) the Plaintiff relied on the representation; and (5) the Plaintiff sustained a loss as the proximate result of its reliance on the representation.[23]

 1. *Sufficiency Under Rule 9(b)*

It is well-established in the Fifth Circuit that the heightened pleading standard under Rule 9(b) applies in the context of a § 523(a)(2)(A) action.[24]   As discussed above, Rule 9(b) generally requires answering the basic information gathering questions of who, what, where, when, and why.[25]   As will be discussed at length below, the Court has little trouble gleaning the answer to

---

[19] *RecoverEdge, L.P. v. Pentecost*, 44 F.3d 1284, 1292–93 (5th Cir. 1995), *abrogated on other grounds by Husky International Electronics, Inc. v. Ritz*, 578 U.S. 356, 136 S. Ct. 1581, 1590 (2016).

[20] *Tomlinson v. Clem (In re Clem)*, 583 B.R. 329, 383–84 (Bankr. N.D. Tex. 2017) (Jernigan, J.) (citing cases).

[21] *Id.* at 384.

[22] *Id.* (internal quotations omitted) (quoting *Cordell v. Sturgeon (In re Sturgeon)*, 496 B.R. 215, 222 (10th Cir. 2013)).

[23] *Selenberg v. Bates (In re Selenberg)*, 856 F.3d 393, 398 (5th Cir. 2017) (citing *In re Ritz*, 787 F.3d 312, 319 (5th Cir. 2015)).

[24] *Bennett v. Lindsey (In re Lindsey)*, 733 Fed. App'x 190, 192 (5th Cir. 2018) (citing *Matter of Haber Oil Co., Inc.*, 12 F.3d 426, 439 (5th Cir. 1994); *In re Monteagudo*, 536 Fed. App'x 456, 458 (5th Cir. 2013)).

[25] *Dual D Health Care Operations, Inc.*, 2021 WL 3083344, at *5 (quoting *Kreway*, 647 Fed. App'x at 437–38).

each of these questions from the allegations in the Complaint. The thrust of the allegations of the Complaint are that Mr. Lager, in entering into the Second Settlement with the Plaintiff in August of 2020, made a series of promises including, for example, promises not to disparage the Plaintiff or to disclose the terms of the Second Settlement publicly, with which he never intended to comply. The allegedly false promises were made in order to induce the Plaintiff to pay him money. The Complaint alleged that Mr. Lager began an unprompted social media campaign following entry into the Second Settlement, evidencing the falsity of his promises. These facts answer the "who, what, where, when, and why."

"The particularity demanded by Rule 9(b) necessarily differs with the facts of each case."[26] Based on the facts of this case, and the detail included in the Complaint, the Court finds that the Complaint sufficiently pleads the particulars of time, place, and contents of the alleged false representations, as well as the identity of the person making them and what he obtained thereby. Thus, the Court finds that the Complaint complies with the pleading standard under Rule 9(b).

## 2. *Existence of a Debt*

The Court finds that the Complaint sufficiently pleads the existence of a debt. The Debtors argue, without citation to authority, that the $453,000.00 right to payment the Plaintiff asserts in its Proof of Claim is not a "debt" obtained by false pretenses, a false representation, or actual fraud within the ambit of § 523(a)(2)(A), but is rather simply damages from a breach of the Second

---

[26] *Brown v. Douglas (In re Specialty Select Care Ctr. of San Antonio, LLC)*, Case No. 17-44248, 2021 Bankr. LEXIS 1933, at *16 (Bankr. N.D. Tex. July 21, 2021) (Morris, J.) (quoting *Tuchman*, 14 F.3d at 1067–68).

Settlement.[27]  The Bankruptcy Code defines debt as "liability on a claim."[28]  The Code defines "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."[29]  Importantly, this definition is intentionally broad and intended to encompass "all legal obligations of the debtor, no matter how remote or contingent."[30]  The Supreme Court, in *Cohen v. De La Cruz*, held that § 523(a)(2)(A) "prevents the discharge of *all* liability arising from fraud," such that even an award of treble damages could fall within the exception.[31]  The Complaint laid out the terms of the Second Settlement in some detail, including the terms regarding remedies on breach of the Second Settlement.[32]  Specifically, the Second Settlement provided for the return of the $453,000.00 paid to Mr. Lager or waived by the Plaintiff in the event of a material breach by Mr. Lager.[33]  The Plaintiff sufficiently alleged, for purposes of the Motion, that but for Mr. Lager's alleged fraud or misrepresentations at the execution of the Second Settlement, it would not have entered the Second Settlement and paid further sums to Mr. Lager.  Thus, the Court finds that the Plaintiff's claim, as set forth in the Complaint, falls within the extremely broad definition of "debt" under § 523(a)(2)(A) as a liability arising from Mr. Lager's alleged fraud.

---

[27] The Debtors moved to reject the Second Settlement on March 4, 2022.  Main Case, ECF No. 49.  The Court entered its Order Granting Motion to Reject Executory Agreement on April 1, 2022.  Main Case, ECF No. 84.  It is well-established law that rejection of an executory contract constitutes a pre-petition breach thereof.  *Mission Prod. Holdings v. Tempnology, LLC*, 139 S. Ct. 1652, 1661, 203 L. Ed. 2d 876 (2019).  Thus, the fact of Mr. Lager's breach of the Second Settlement is not in dispute, regardless of Plaintiff's extensive allegations of Mr. Lager's repeated breaches pre-petition and pre-rejection.  Nevertheless, the timing of Mr. Lager's alleged pre-petition breach is central to the Plaintiff's claims.

[28] 11 U.S.C. § 101(12).

[29] *Id.* at § 101(5)(A).

[30] *In re Egleston*, 448 F.3d 803, 812 (5th Cir. 2006).

[31] 523 U.S. 213, 215, 118 S. Ct. 1212, 140 L. Ed. 2d 341 (1998) (emphasis added).

[32] Complaint, ECF No. 14 ¶¶ 18–22, 25, 29–30.

[33] *Id.* ¶ 29.

   3.    *Existence of a Misrepresentation*

Next, the Court finds that the Complaint sufficiently pleads the existence of a representation that Mr. Lager knew was false or that he made with the intent and purpose to deceive the Plaintiff or for the purpose of inducing the Plaintiff to part with money or property.    The Complaint specifically alleges that "[a]t all times material, [Mr.] Lager did not intend to comply with the terms of the Second Settlement."[34]    The Debtors, in the Reply, describe this allegation as "precisely the conclusory and speculative allegation[] that *Twombly*, *Iqbal*, and the Fifth Circuit in a vast number of decisions identify as insufficient."[35]    Nevertheless, the Debtors failed to cite any of the "vast number" of Fifth Circuit cases to which they refer.    Regardless, the Court disagrees.

The Plaintiff cited in the Surreply a litany of Texas state law cases relevant to the question of whether a promise to perform under a contract may be an actionable misrepresentation and what evidence may be considered with regard to so-called "intent not to perform."    The Fifth Circuit has held that the elements under § 523(a)(2)(A) are nearly identical to those of a Texas state-law fraud claim.[36]    Thus, the Court finds the authority cited by the Plaintiff in the Surreply instructive, even if not binding.    For example, in *Aquaplex v. Rancho La Valencia, Inc.*, the Texas Supreme Court held that "[a] promise of future performance constitutes an actionable misrepresentation if the promise was made with no intention of performing at the time it was made."[37]    Moreover, the Texas Supreme Court held that proving intent not to perform is difficult, as fraudulent intent is not normally susceptible to direct proof.[38]    Thus, under Texas law, "breach combined with slight

---

[34] *Id.* ¶ 122.
[35] Reply, ECF No. 21 ¶ 10.
[36] *Park v. Chang (In re Park)*, 271 Fed. App'x 398, 400 (5th Cir. 2008); *Guion v. Sims (In re Sims)*, 479 B.R. 415, 420 (Bankr. S.D. Tex. 2012) (citing *Park*, 271 Fed. App'x at 420).
[37] 397 S.W.3d 768, 774 (Tex. 2009).
[38] *Id.* at 774–75.

circumstantial evidence of fraud is . . . enough [evidence] to support a verdict."[39] Finally, the Texas Supreme Court held that, although fraudulent intent is determined at the time the party made the challenged representation, it may also be inferred from the party's subsequent acts.[40]

The Court further finds analogy in the Fifth Circuit's opinion in *AT&T Universal Card Servs. v. Mercer (In re Mercer)*.[41] Among other issues, the Fifth Circuit addressed whether the debtor, upon using her credit card for cash advances, made a representation of her intent to repay the credit extended and whether such a representation could support a § 523(a)(2)(A) claim.[42] The Fifth Circuit held that "each card-use forms a unilateral contract" through which "the holder '*promises* to repay the debt . . . and the . . . issuer *performs* by reimbursing the merchant who . . . accepted the . . . card in payment."[43] Poignantly, the Fifth Circuit further held the following:

> A misrepresentation can be one of '*fact*, opinion, *intention* or law.' If, as here, the misrepresentation concerns *intention* to perform an agreement, that intention '*may be expressed* but it is *normally merely to be implied* from the making of the agreement'. '[A] promise *necessarily* carries with it the *implied assertion* of an *intention to perform*'. Accordingly, Mercer's card-use representation included her '*implied assertion* of an intention to perform'.[44]

In this case, the issue is not whether Mr. Lager executed the Second Settlement. All Parties agree that he did, and the Complaint so alleges. In fact, counsel for the Debtors conceded during the hearing that a representation in executing an agreement paired with an intent not to comply with a contract could support a § 523(a)(2)(A) claim. Rather, the question is whether the Plaintiff stated sufficient factual allegations in the Complaint, taken as true and drawing all reasonable

---

[39] *Id.* at 775 (internal quotations omitted) (quoting *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 305 (Tex. 2006)); *see Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986) (holding the same).

[40] *Id.* (citing *Spoljaric*, 708 S.W.2d at 434).

[41] 246 F.3d 391 (5th Cir. 2001).

[42] *Id.* at 405.

[43] *Id.* (quoting *Anastas v. American Sav. Bank (In re Anastas)*, 94 F.3d 1280, 1285 (9th Cir. 1996)) (emphasis in original).

[44] *Id.* at 406–07 (quoting Restatement (Second) of Torts §§ 525, 525 cmt. b, 530 cmt. c. (Am. L. Inst. 1965)) (emphasis in original).

inferences in its favor, to plausibly plead a misrepresentation and fraudulent intent. The Complaint sufficiently alleges that the parties executed the Second Settlement. In executing the Second Settlement, the Court finds that Mr. Lager made a representation of his intention to comply therewith.[45] Thereafter, approximately nine months later, it is alleged that Mr. Lager began to systematically breach it without provocation. The Plaintiff paints this nine-month period as a "short time," a characterization with which the Court will not agree or disagree at the pleading stage. Nevertheless, the Court does find that the Complaint pleads sufficient facts showing that Mr. Lager, during the term of the Second Settlement, began a social media campaign targeted directly at the Plaintiff and plausibly in breach of the Non-Disparagement Clause and NDA. Thus, the Complaint pleads a breach and sufficient "circumstantial evidence of fraud" to survive the Motion at this stage.

   4.   *Reliance*

The Court finds that the Complaint states sufficient facts as to reliance, both justifiable and actual. The Debtors point primarily to the terms of the Second Settlement for their argument on this point, stating that, because the Second Settlement "contemplated" Mr. Lager's breach and provided remedies stemming therefrom, the Plaintiff was not relying on Mr. Lager's representation that he would in fact comply with the Second Settlement. The Debtors also argue that, under Florida law, the Plaintiff was not entitled to rely on Mr. Lager's representations due to the adversarial nature of the circumstances surrounding the Second Settlement.[46] An element of proving nondischargeability for false representations or false pretenses is reliance in fact,

---

[45] *See id.* at 405–07; *Cardwell v. Gurley*, No. 4-10-CV-706, 2011 WL 6338813, at *6 (E.D. Tex. Dec. 19, 2011), *aff'd sub nom. In re Cardwell*, 487 F. App'x 183 (5th Cir. 2012) ("A debtor's misrepresentations of his intentions, however, may constitute a false representation within the meaning of the dischargeability provision if, when the representation is made, the debtor has no intention of performing as promised.") (citing *Matter of Allison*, 960 2 F.2d 481, 484 (5th Cir. 1992)).

[46] Reply, ECF No. 21 ¶ 11 (citing numerous Eleventh Circuit cases and one Ninth Circuit case).

regardless of whether such reliance was reasonable or justifiable.[47]  The applicable reliance standard under § 523(a)(2)(A) to prove actual fraud is justifiable reliance, a midpoint between reasonable reliance and reliance in fact.[48]  Justifiable reliance does not impose a duty to investigate unless the falsity of a representation is readily apparent or obvious or there are "red flags" indicating reliance is unwarranted.[49]

The authority posited by the Debtors with regard to reliance on promises made pursuant to settlement agreements is both inapposite and defeated by the express terms of the Second Settlement.  The Debtors cited a string of authority from the Eleventh Circuit they argue stands for the proposition that parties engaging in settlement discussions may not rely on the representations of the settling counterparty.  The Debtors read these cases far too broadly.  For example, in *Affiliati Network, Inc. v. Wanamaker*, the Eleventh Circuit held that "a *settlement fraud claimant* cannot prove reasonable reliance on a party's misrepresentations if he settles a dispute involving accusations that the other party was guilty of fraud or other dishonest conduct."[50]  The remainder of the Debtors' cited authority suffers a similar infirmity.[51]  Neither the First Settlement nor the Second Settlement, according to the Complaint, involved allegations that Mr. Lager had acted fraudulently or dishonestly.  Instead, the First and Second Settlements sought to resolve disputes

---

[47] *RecoverEdge*, 44 F.3d at 1292 (citing *In re Allison*, 960 F.2d 481, 483 (5th Cir. 1992)).

[48] *Moody Nat'l Bank v. Shurley (In re Shurley)*, Case No. 19-1278, 2021 Bankr. LEXIS 3249, at *18 (Bankr. W.D. Tex. Nov. 24, 2021) (citing *Field v. Mans*, 516 U.S. 59, 74, 116 S. Ct. 437, 133 L. Ed. 2d 351 (1995); *Moss v. Littleton*, No. 3:01-CV-2260-L, 2002 U.S. Dist. LEXIS 18137, at *3 n.2 (N.D. Tex. Sept. 26, 2002)).

[49] *Hurst v. Manheim Auto. Fin. Servs. (In re Hurst)*, 337 B.R. 125, 133–34 (Bankr. N.D. Tex. 2005) (Jones, J.).

[50] 847 Fed. App'x 583, 586 (11th Cir. 2021) (internal quotations omitted) (emphasis added) (quoting *Green Leaf Nursery v. E.I. DuPont De Nemours & Co.*, 341 F.3d 1292, 1300 (11th Cir. 2003)).

[51] *See Green Leaf Nursery*, 341 F.3d at 1304–05 ("When negotiating or attempting to compromise an existing controversy *over fraud and dishonesty* it is unreasonable to rely on representations made by the allegedly dishonest parties.") (emphasis added); *Mergens v. Dreyfoos*, 166 F.3d 1114, 1118–19 (11th Cir. 1999) (same).  The Debtors also cited *Facebook, Inc. v. Pac. Northwest Software, Inc.*, which is also distinguishable on the basis that the settlement occurred while the parties were already in litigation.  640 F.3d 1034, 1039 (9th Cir. 2011).  The Ninth Circuit held that parties "involved in litigation" have a duty of inquiry and that "[t]hey can use discovery to ferret out a great deal of information before even commencing settlement negotiations."  *Id.*  At the time of the execution of the Second Settlement, the Parties were not in litigation; the Second Settlement was executed after mediation and intended to avoid litigation.

regarding the termination of the Franchise Agreements and past due franchise fees.[52]  Moreover, the terms of the Second Settlement expressly provide that Mr. Lager's representations and agreements were a "*material inducement* to the [Plaintiff's] agreement to enter into [the Second Settlement], such that the [Plaintiff] would not have entered into [the Second Settlement] in the absence of such agreements by the [Debtors]."[53]

Through the Complaint, the Plaintiff alleged a detailed factual record regarding the Parties' relationship from the beginning thereof in 2010, through the execution of the First Settlement in 2020, and the execution of the Second Settlement later that year.  The Court does not find it difficult, based on these factual allegations and the express terms of the Second Settlement, to draw the reasonable inference that the Plaintiff relied, both justifiably and in fact, on Mr. Lager's promise to perform under the Second Settlement in paying to Mr. Lager the amounts contemplated therein.  Thus, the Court finds that the Complaint sufficiently pleads both justifiable reliance and reliance-in-fact under § 523(a)(2)(A).

In summary, the Court finds that the Complaint sufficiently pleads the necessary elements under § 523(a)(2)(A) such that Count III stated in the Complaint should not be dismissed at this juncture.  As such, the Motion will be **DENIED** insofar as it seeks dismissal of Count III under Rules 9(b) and 12(b)(6).

## C.    Nondischargeability Pursuant to § 523(a)(6)

The Debtors also seek dismissal of the Plaintiff's Count IV seeking a determination of nondischargeability pursuant to § 523(a)(6) of the Bankruptcy Code.  The Debtors argue in the

---

[52] The Plaintiff did state in the Complaint that, in connection with the execution of the Second Settlement, Mr. Lager threatened the Plaintiff with "false claims for defamation and racial discrimination."  Complaint, ECF No. 14 ¶ 16. The Court interprets this statement, as it must, in the light most favorable to the Plaintiff and does not find this strategic language to be dispositive on this point.
[53] Main Case, ECF No. 37-2 at 14 (emphasis added).

Motion that the injury at issue here sounds in breach of contract, rather than intentional tort, and that such injuries do not fall within the reach of § 523(a)(6). The Plaintiff, in response, argues that the pattern of conduct in which Mr. Lager engaged after the execution of the Second Settlement evidences an intent to injure the Plaintiff.

Section 523(a)(6) excepts from discharge debts resulting from willful and malicious injuries caused by a debtor to another entity.[54] "The test for willful and malicious injury under § 523(a)(6) . . . is condensed into a single inquiry of whether there exists 'either an objective substantial certainty of harm or a subjective motive to cause harm' on the part of the debtor."[55] Moreover, the debtor must have intended the actual injury that resulted.[56] As the Debtors correctly point out, this Court previously found that the exception to discharge under § 523(a)(6), when successfully litigated, is "almost universally in the context of a tort claim."[57] Nevertheless, the Fifth Circuit has held that "a knowing breach of a clear contractual obligation that is certain to cause injury may prevent discharge under Section 523(a)(6), regardless of the existence of separate tortious conduct."[58] The Court would note that most claims emanating in the realm of business disparagement sound in tort.[59] Finally, § 523(a)(6) claims are not subject to the heightened pleading standard under Rule 9(b).[60]

---

[54] 11 U.S.C. § 523(a)(6).
[55] *Berry v. Vollbracht (In re Vollbracht)*, 276 F. App'x 360, 361 (5th Cir. 2007) (quoting *Williams v. IBEW Local 520 (In re Williams)*, 337 F.3d 504, 509 (5th Cir. 2003)); *Reticulum Mgmt., LLC v. Watters (In re Watters)*, Adv. No. 20-3088, 2021 Bankr. LEXIS 2309, at *50 (Bankr. N.D. Tex. Aug. 24, 2021) (quoting *Fairlane Fixed Income Fund, LLC v. Feigl (In re Feigl)*, Adv. No. 20-3011, 2020 Bankr. LEXIS 2506, at *21–22 (Bankr. N.D. Tex. Sept. 25, 2020)).
[56] *Texas v. Walker*, 142 F.3d 813, 823 (5th Cir. 1998).
[57] *Watters*, 2021 Bankr. LEXIS 2309, at *52 (citing *Feigl*, 2020 Bankr. LEXIS 2506, at *21).
[58] *Williams*, 337 F.3d at 510.
[59] *See Zaretsky v. Zaretsky (In re Zaretsky)*, Case No. 8-16-71614, 2018 WL 2085614, at *3–4 (Bankr. E.D.N.Y. May 3, 2018) (finding that the debtor's defamatory statements caused a willful and malicious injury to the plaintiff which was nondischargeable pursuant to § 523(a)(6)).
[60] *In re Kilroy*, 354 B.R. 476, 489 (Bankr. S.D. Tex. 2006), *aff'd sub nom Kilroy v. Guerriero*, No. 06-3320, 2007 WL 1456006 (S.D. Tex. May 15, 2007).

Here, the Court finds that the Complaint sufficiently pleads that Mr. Lager breached the Second Settlement, that such breach was substantially certain to cause the Plaintiff harm, and that Mr. Lager intended the harm that resulted.  At this stage, the Court is required to take the well-plead allegations in the Complaint as true and draw all reasonable inferences in favor of the Plaintiff.  The Complaint lays out, in painstaking detail, approximately twenty instances of alleged pre-petition breaches of the Second Settlement either by Mr. Lager directly or enabled by him through "unhappyfranchisee.com."  Many of these posts reference Mr. Lager's "franchise" or, in other instances, the Plaintiff directly by name.  Moreover, these references are very often accompanied by accusations of racially discriminatory practices and general franchisee abuse. These allegations are not conclusory or threadbare, screenshots of the allegedly breaching posts are included in the Complaint.

Thus, the Court need not engage in the slightest mental gymnastics to discern the asserted willful and malicious injury in this case.  Taking the Complaint as true, Mr. Lager, either directly or through his connections to "unhappyfranchisee.com," repeatedly accused the Plaintiff of being a racially discriminatory and abusive company while he was subject to the Non-Disparagement Clause and the NDA.  Moreover, these posts appear, based on the allegations in the Complaint, to be unprompted, as the Complaint does not allege any interaction between Mr. Lager and the Plaintiff in the nine months between the execution of the Second Settlement and Mr. Lager's first allegedly disparaging post on LinkedIn.  Finally, Mr. Lager is not a layman in his industry.  In one post, he described himself as a "successful 57-year-old . . . businessman," "always in the top 5% of sales," and a "Poster Boy for franchising."[61]  Thus, the Court may easily infer that Mr. Lager not only understood the potential consequences of accusing another business of racially

---

[61] Complaint, ECF No. 14 at 11.

discriminatory practices but intended such accusations to harm the Plaintiff's reputation. Additionally, the Court may infer that Mr. Lager intended to breach the Second Settlement in doing so.

The Court therefore finds that the Complaint sufficiently alleged a knowing breach of a clear contractual obligation that was certain to cause injury.  For this reason, the Motion will be **DENIED** insofar as it seeks dismissal of Count IV under Rule 12(b)(6).

### D.      Counts I and II Seeking Equitable Relief

Finally, the Debtors seek dismissal of Counts I and II in the Complaint for failing to state a ground upon which equitable relief may be granted.  The Debtors rely on their rejection of the Second Settlement as of April 1, 2022 and argue that such rejection constitutes a repudiation of any performance by Mr. Lager under that agreement.  Moreover, the Debtors argue that, by virtue of their rejection, even if the Plaintiff could state claims for equitable relief, such claims would only give rise to monetary damages, and would not entitle the Plaintiff to a temporary or permanent injunction.  The Plaintiff argues that rejection is irrelevant with regard to the continued enforceability of the Non-Disparagement Clause and the NDA,[62] because the Second Settlement does not require any affirmative performance by Mr. Lager and the injunctions sought are necessary to preserve the Plaintiff's contractual rights moving forward.

A great deal of the Parties' argument on these Counts focuses on competing interpretations of the Supreme Court's recent holding in *Mission Prod. Holdings v. Tempnology, LLC (In re Tempnology, LLC)*.[63]  According to the Debtors, the Supreme Court held in *Tempnology* that rejection of an executory contract constitutes a breach and repudiation of all future performance

---

[62] The Plaintiff expressly stated at the hearing that it was not seeking injunctive relief to enforce the noncompetition clause in the Second Settlement.

[63] 139 S. Ct. 1652, 203 L. Ed. 2d 876 (2019).

under the rejected contract by the debtor (including action or inaction by the debtor). The Plaintiff disagrees, instead reading *Tempnology* more narrowly.

In *Tempnology*, Tempnology, LLC licensed its "Coolcore" trademark to Mission Product Holdings, Inc. through a non-exclusive license, allowing Mission to use the Coolcore mark both domestically and internationally.[64] Thereafter, and prior to the expiration of the non-exclusive license, Tempnology filed a Chapter 11 bankruptcy petition and sought to reject the licensing agreement with Mission.[65] The question before the Supreme Court was the effect of rejection of an executory contract pursuant to 11 U.S.C. § 365(g).[66] Specifically, the Supreme Court considered whether, post-rejection, Mission could continue to use the Coolcore mark.[67] The parties in *Tempnology* advanced two different views of the effect of rejection: (1) rejection as breach and (2) rejection as rescission.[68] Consistent with the plain language of § 365(g), the Supreme Court rejected the rejection as rescission approach, instead holding that "[r]ejection of a contract—any contract—in bankruptcy operates not as a rescission, but as a breach."[69] The import of this holding is that rejection "does not terminate the contract."[70] Rather, "the counterparty retains the rights it has received under the agreement."[71] The Supreme Court further stated that "if the not-yet debtor was subject to a counterparty's contractual right . . . , so too is the trustee or debtor once the bankruptcy petition has been filed."[72] In so preserving the counterparty's rights, "the rule prevents a debtor in bankruptcy from recapturing interests it had given up."[73]

---

[64] *Id.* at 1658.
[65] *Id.*
[66] *Id.* at 1661.
[67] *Id.* at 1659.
[68] *Id.* at 1661.
[69] *Id.*
[70] *Id.* at 1662.
[71] *Id.*
[72] *Id.* at 1663.
[73] *Id.*

Accordingly, the Supreme Court held that Mission could continue using the Coolcore mark post-rejection because the rejection of the license agreement left undisturbed the contractual rights of the non-breaching party.[74]  The Supreme Court expressly rejected the argument that such a result mandated affirmative performance under the license agreement by Tempnology, which argued it would be required to monitor its mark and Mission's use thereof unless the license was terminated.[75]

The position the Debtors advance in the Motion is essentially "rejection as rescission" dressed up to appear to be consistent with "rejection as breach."  The Debtors wish to be free of all burdens imposed on them by the Second Settlement but do not answer the operative question post-*Tempnology*: how does their position not rob the Plaintiff of its rights under the Second Settlement?  Pointedly, the Court inquired during the hearing on the Motion whether *outside* bankruptcy, Mr. Lager's breach of the Second Settlement would have absolved him of any continuing duty to comply with the Non-Disparagement Clause and NDA.  In response, counsel for the Debtors conceded that, outside of bankruptcy, the Plaintiff would be entitled to seek injunctive relief enforcing the Non-Disparagement Clause and NDA.  In so conceding, the Debtors have likewise conceded that their position amounts to an attempt to differentiate a breach through rejection in a bankruptcy proceeding from a breach outside of bankruptcy.  The Supreme Court, in *Tempnology*, rejected precisely this position.[76]  "A rejection does not terminate the contract.  When it occurs, the debtor and counterparty do not go back to their pre-contract positions.  Instead, the

---

[74] *Id.* at 1666.

[75] *Id.* at 1665–66.

[76] *See id.* at 1661 ("Rejection 'constitutes a breach of [an executory] contract,' deemed to occur 'immediately before the date of the filing of the petition.' Or said more pithily for current purposes, a rejection is a breach. And 'breach' is neither a defined nor a specialized term. It means in the Code what it means in contract law outside bankruptcy.") (internal quotations omitted).

counterparty retains the rights it has received under the agreement. ***As after a breach, so too after a rejection, those rights survive***."[77]

The Debtors make further attempt at fitting their "square peg" argument into the "round hole" holding of *Tempnology* by citation to *Caliber North Dakota LLC v. Nine Points Energy Holdings, Inc. (In re Nine Points Energy Holdings, Inc.)*.[78] The Court finds *Nine* Points factually and legally distinguishable, and certainly not determinative. In *Nine Points*, the District Court for the District of Delaware, in interpreting *Tempnology*, found that *Tempnology* "stands for the proposition that rejection cannot restrain a non-debtor's use of contractual rights that do not depend on the debtor's future performance; it does not allow a non-debtor to force the debtor to perform under a contract after its rejection."[79] The debtor in that case, an independent oil and gas exploration company, rejected through its bankruptcy an executory contract pursuant to which the debtor agreed to exclusively utilize the counterparty's midstream services for gas harvested from certain enumerated production properties.[80] The counterparty argued that, although the debtor was no longer required to perform under the contract, the debtor's rejection left intact the counterparty's right to receive gas from the debtor (which was forbidden to send gas to other midstream service providers) and to continue performing the counterparty's midstream services under the contract.[81] The District Court rejected this position and found that the counterparty's position necessarily would require the debtor's continued performance under the agreement.[82] The District Court distinguished *Tempnology* and found "unlike the trademark licensee who could use the debtor's intellectual property without the involvement of the debtor, in this case . . . [the

---

[77] *Id.* at 1662 (emphasis added).
[78] 633 B.R. 124 (D. Del. 2021).
[79] *Id.* at 135.
[80] *Id.* at 134.
[81] *Id.* at 134–35.
[82] *Id.* at 135–36.

counterparty] has no right to use the Interests and Dedications <u>except</u> in its performance of the contracts . . . which can only occur after the Debtors perform."[83]  Thus, the key to the *Nine Points* holding is ***performance***.

In this case, neither the Non-Disparagement Clause nor the NDA requires affirmative action on the part of Mr. Lager, which this Court finds to be a ***critical*** distinction.  Merely refraining from action, as in the case of complying with the restrictive covenants at issue here, does not constitute affirmative performance under a contract.[84]  A number of courts have found that compliance with a restrictive covenant that merely requires a debtor *to refrain* from conduct does not constitute a debt or claim subject to discharge and that the restrictive covenant *survives rejection*.[85]  Likewise, in *In re Chestnut Ridge Plaza Associates, L.P.*, in considering whether to approve the rejection of a residential lease, the Bankruptcy Court for the Western District of Pennsylvania found that a restrictive covenant in a residential lease would survive the debtor's rejection of the lease.[86]  Finding otherwise would have the "impermissible result" of the "tenant's leasehold interest be[ing] diminished, changed and modified due to bankruptcy's intervention."[87]

The Non-Disparagement Clause and the NDA simply require Mr. Lager to *refrain* from disparaging the Plaintiff and *refrain* from disclosing the terms of the Second Settlement.  Compliance imposes no affirmative duties on and requires no services to be rendered by the Debtors.  Compliance does not require the Debtors to spend money.  Compliance does not affect the Debtors' business in any conceivable way.  Said differently, the Plaintiff specifically negotiated

---

[83] *Id.* at 136 (emphasis in original).

[84] *In re Annabel*, 263 B.R. 19, 27 (N.D.N.Y. 2001).

[85] *In re The Ground Round, Inc.*, 335 B.R. 253 (1st Cir. B.A.P. 2005); *Annabel*, 263 B.R. at 27; *In re Hurvitz*, 554 B.R. 35 (Bankr. D. Mass. 2016); *In re Weathers*, 465 B.R. 782, 786 (Bankr. N.D. Miss. 2011); *Sir Speedy, Inc. v. Morse, Jr.*, 256 B.R. 657 (Bankr. D. Mass. 2000); *In re Steaks To Go, Inc.*, 226 B.R. 35, 38 (Bankr. E.D. Mo. 1998); *In re Klein*, 218 B.R. 787 (Bankr. W.D. Pa. 1998); *In re Hirschhorn*, 156 B.R. 379, 388 (Bankr. E.D. N.Y. 1993); *In re Don & Lin Trucking Company, Inc.*, 110 B.R. 562 (Bankr. N.D. Ala. 1990).

[86] 156 B.R. 477, 480–81 (Bankr. W.D. Penn. 1993).

[87] *Id.* at 480–81.

for the right under the Second Settlement to be free from Mr. Lager's disparagement and the right to maintain the confidentiality of the terms of the Second Settlement. Unlike in *Nine Points*, where enforcing the counterparty's purported rights required the debtor to *do something*, *i.e.*, continue to contract together, enforcing the Plaintiff's contractual rights in this case simply requires the Debtors to *not do something*. Absent enforcement, the Plaintiff does not receive the rights to which it is entitled as a non-breaching party under the Second Settlement.

Thus, this Court is compelled, under the reasoning set forth in *Tempnology*, to find that the effect of rejection of the Second Settlement was that Mr. Lager is deemed to have breached the agreement as of the petition date, that the Plaintiff's contractual rights thereunder remain intact, and that, as a matter of law, *Tempnology* is no obstacle to the Plaintiff seeking equitable relief in the Complaint on account of the Non-Disparagement Clause and NDA.

The Debtors also argue in the Motion that, after rejection, the only remedy available to the Plaintiff is a claim for money damages. In support of this argument, the Debtors cite a long string of cases purporting to stand for the proposition that, where monetary damages are available as an alternative form of relief, rejection gives rise *only* to a claim for money damages.[88] The Court reviewed each of these cases and found them generally distinguishable or, at times, contradictory to the parentheticals included in the Debtors' Motion and Reply.[89] More importantly, in *Sheerin v. Davis (In re Davis)*, the debtor argued that certain equitable remedies imposed by a state court against him were dischargeable.[90] The debtor contended that, because failure to perform his obligations under any of the equitable remedies would justify an award of money damages, all

---

[88] Motion, ECF No. 18 ¶ 32 n.30; Reply, ECF No. 21 ¶ 19 n.10.
[89] The Court addressed many of these issues during the hearing and need not detail each and every case for purposes of this Order. The Plaintiff also distinguished each of the cases as part of its oral argument.
[90] 3 F.3d 113, 116 (5th Cir. 1993).

such remedies were dischargeable.[91] The Fifth Circuit declined to define "claim" under § 105(5)(B) so broadly and held that § 101(5)(B) "does not require creditors entitled to an equitable remedy to select a suboptimal remedy of money damages."[92] Moreover, in this case, the Plaintiff cited numerous decisions from varying jurisdictions in which courts have found that money damages are inadequate to remedy violations of non-disparagement and confidentiality agreements.[93] Thus, the next inquiry is whether, under applicable state law (Florida state law),[94] injunctive relief would be available to the Plaintiff outside bankruptcy.

Florida Statutes § 542.335 governs "valid restraints of trade or commerce" including enforcement of restrictive covenants.[95] The statute, however, does not define "restrictive covenants."[96] The Florida Supreme Court has held that the statute is non-exhaustive and, moreover, the Parties appear to be in agreement that it governs the Non-Disparagement Clause and the NDA.[97] Not only is injunctive relief available under Fla. Stat. § 542.335, it is the preferred remedy.[98] The statute creates a presumption of irreparable harm resulting from the violation of an enforceable restrictive covenant.[99] Thus, the Court finds that, under Florida law, injunctive relief

---

[91] *Id.*

[92] *Id.*; *see Baerg Real Prop. Trust v. Garland Sol., LLC (In re Baerg Real Prop. Trust)*, 585 B.R. 373, 393–94 (Bankr. N.D. Tex. 2018) (Houser, J.) (discussing *Davis* and citing other, similar cases).

[93] *Millennial Plastic Surgery PLLC v. James*, No. 21 CIV. 9590 (ER), 2021 WL 5988322, at *2 (S.D.N.Y. Dec. 16, 2021); *Osteostrong Franchising, LLC v. Rhodes*, No. 4:20-CV-465, 2020 WL 8970652, at *6 (S.D. Tex. Dec. 10, 2020); *Perricone v. Perricone*, 972 A.2d 666, 675 (Conn. 2009); *Wood v. Wade*, 869 S.E.2d 111, 118 (Ga. App. 2022); *AmeriGas Propane Inc. v. Sanchez*, 335 So.3d 1253, 1258 (Fla. Dist. Ct. App. 2021); *Family Heritage Life Ins. Co. v. Combined Ins. Company of America*, 319 So.3d 680 (Fla. Dist. Ct. App. 2021); *Walls v. Klein*, No. 04-12-00615-CV, 2013 WL 988179, at *1 (Tex. App. Mar. 13, 2013); *Taylor v. DeRosa*, No. 03-08-00199-CV, 2010 WL 1170228, at *2 (Tex. App., March 24, 2010); Aultcare Corp. v. *Roach*, 2007-Ohio-5686, ¶ 39 (5th Dist. Oct. 22, 2007).

[94] The Second Settlement provides that it is governed by Florida law. Main Case, ECF No. 37-2 at 14.

[95] Fla. Stat. § 542.335.

[96] *White v. Mederi Caretenders Visiting Servs. of Se. Fla., LLC*, 226 So. 3d 774, 784 n.3 (Fla. 2017).

[97] *Id.* at 786; *see* Response, ECF No. 20 at 18; Reply, ECF No. 21 ¶¶ 24–25.

[98] *Lae Beauty, Inc. v. Giansanti*, Case No. 01-2017-CA-001168, 2018 Fla. Cir. LEXIS 786, at *19 (Fla. Cir. Ct. Apr. 16, 2018).

[99] Fla. Stat. § 542.335(1)(j).

would be the preferred remedy for Mr. Lager's alleged violations of the Non-Disparagement Clause and NDA outside bankruptcy and is available as a remedy in this case.

Nevertheless, the statute also provides that "a court shall enforce a restrictive covenant by any appropriate and effective remedy, including, *but not limited to*, temporary and permanent injunctions."[100] The Debtors urge that the Second Settlement includes a liquidated damages clause which both rebuts the presumption of irreparable harm and is an appropriate and effective remedy for Mr. Lager's breach of the Second Settlement. In support of this argument, the Debtors again cite a long string of cases from Florida state and district courts purporting to support that liquidated damages supplant equitable relief.

First, the Plaintiff noted persuasively in argument that there are significant infirmities in the Debtors' cited caselaw. For example, the Debtors cite *Litwinczuk v. Palm Beach Cardiovascular Clinic, L.C.* in support of their position. In that case, the District Court of Appeal of Florida, Fourth District, *upheld* a temporary injunction enforcing a covenant not to compete because the covenant: (1) protected a legitimate business interest and (2) the appellant failed to overcome the presumption of irreparable injury.[101] Even those cases that were on point fail to support that, as a matter of law and for purposes of a Rule 12(b)(6) motion, injunctive relief is not available to the Plaintiff in this case.[102]

The Second Settlement provides that, in the event of Mr. Lager's material breach of the Second Settlement, he would be required to pay to the Plaintiff all amounts paid to him or waived on his behalf by the Plaintiff thereunder.[103] The Second Settlement also provides, however, in the

---

[100] *Id.*

[101] 939 So. 2d 268, 272 (Fla. Dist. Ct. App. 2006).

[102] *See, e.g., First Miami Sec., Inc. v. Bell*, 758 So. 2d 1229, 1230 (Fla. Dist. Ct. App. 2000) (holding that, *after a trial*, a former employee proved that damages were ascertainable and therefore rebutted the presumption of irreparable harm).

[103] Main Case, ECF No. 37-2 at 13.

very next paragraph, that the Parties are entitled to recover from each other actual damages.[104]  The Court must read the Second Settlement in the light most favorable to the Plaintiff at this stage and therefore finds that, although the Second Settlement does contemplate *some* measure of liquidated damages, it does not *limit* remedies available to the Plaintiff to those liquidated damages.   Thus, reading the Fifth Circuit's *Davis* decision, Fla. Stat. § 542.335, the Second Settlement, and the allegations in the Complaint in conjunction, the Court finds that the Debtors have failed to show that, as a matter of law, the Plaintiff is not entitled to injunctive relief in this case.   The Motion will,  therefore,  be **DENIED** insofar as it seeks dismissal of Counts I and II of the Complaint pursuant to Rule 12(b)(6).

Therefore, based upon the foregoing, it is hereby:

**ORDERED** that the Debtors' Motion to dismiss Plaintiff's Complaint is hereby **DENIED** in its entirety.

**###END OF ORDER###**

---

[104] *Id.*