

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed July 20, 2023**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **JAMES BRADLEY LAGER**, *et al.*,[1] | § | **Case No. 22-30072-MVL-11** |
| | § | |
| Debtors. | § | |
| | § | |
| **PIRTEK USA, LLC,** | § | **Adv. No. 22-03042-MVL** |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| **JAMES BRADLEY LAGER & JBL HOSE** | § | |
| **SERVICE LLC dba TEXAS HOSE PRO,** | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER ON PLAINTIFF'S MOTION FOR
## SUMMARY JUDGMENT

---

[1] The above-captioned bankruptcy case is being jointly administered with *In re JBL Hose Service, LLC*, Case No. 22-30439-MVL11 pursuant to this Court's order entered on March 14, 2022, in Case No. 22-30072-MVL11 (hereinafter the "**Main Bankruptcy Case**"), at ECF No. 54.

Before the Court[2] is the *Motion for Summary Judgment* (the "**Motion**" or "**MSJ**")
submitted by Plaintiff PIRTEK USA, LLC ("**PIRTEK**" or the "**Plaintiff**") [ECF No. 38].[3]
PIRTEK seeks summary judgment on Counts I through III of its *Complaint for Damages,
Injunctive Relief and for Non-Dischargeability of Debt* (the "**Original Complaint**") as amended
on May 25, 2022, (the "**Amended Complaint**"), as well as a determination in its favor against
Defendants James Bradley Lager ("**Mr. Lager**") and JBL Hose Service, LLC D/B/A Texas Hose
Pro ("**JBL**," and together with Mr. Lager, the "**Defendants**," and together with the Plaintiff, the
"**Parties**") on their affirmative defenses and counterclaims. Having considered the evidence
presented in support of and in opposition to the Motion, the Court hereby finds that the Plaintiff's
MSJ should be **GRANTED in part, and DENIED, in part.**

## I.    JURSIDICTION.

Bankruptcy subject matter jurisdiction exists in this proceeding pursuant to 28 U.S.C. §
1334. This is a statutory core proceeding pursuant to 28 U.S.C. § 157(b); thus, the Court has
statutory authority to enter a final order. Moreover, the Parties consent to the entry of final orders
and judgments by this Court. ECF No. 14, p. 2, ¶ 6. Venue is proper in this district pursuant to 28
U.S.C. § 1409(a).

## II.    UNDISPUTED FACTS AND PROCEDURAL HISTORY.

PIRTEK is a company engaged in the sale, custom assembly and installation of industrial
and hydraulic hoses, fixed tube assemblies, fittings and related components and products. ECF No.
38-1, p. 5; ECF No. 38-2, p. 8. PIRTEK franchises its system of doing business and has more than

---

[2] All capitalized references to the Court (the "**Court**") refer to the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.
[3] All ECF No. references made herein are in reference to the docket maintained by the Bankruptcy Clerk in Adv. Pro. No. 22-03042-MVL (the "**Adversary Proceeding**"), unless otherwise indicated.

100 locations in the United States. *Id.* Mr. Lager is the sole owner of JBL. ECF No. 46, p. 5. JBL

is engaged in the same business as PIRTEK. ECF No. 38-2, pp. 105–06. JBL was previously an

owner of two franchises under PIRTEK's brand, pursuant to franchise agreements dated May 3,

2010, and November 12, 2012 (the "**Franchise Agreements**"). *Id.*; ECF No. 38-2, p. 8.

In 2019, PIRTEK provided notice to the Defendants that it would not be renewing the

Franchise Agreements. ECF No. 38-2, p. 9; ECF No. 46, p. 6. After extensive negotiation, the

Parties settled on terms for the Defendants' exit from the PIRTEK franchise system, embodied in

a Mutual Termination and Release Agreement (the "**First Settlement**"). ECF No. 38-2, p. 8; ECF

No. 46, p. 6. The First Settlement officially terminated the Franchise Agreements on January 13,

2020. ECF No. 38-2, p. 9. Defendants agreed to pay PIRTEK over $100,000.00 to settle their debt

under the Franchise Agreements, also agreeing therein to refrain from disparaging PIRTEK and to

keep the existence and terms of the First Settlement confidential. ECF No. 38-2 pp. 122–123; ECF

No. 38-3, 116–118. In exchange, PIRTEK agreed to release the Defendants from their non-

competition obligations. ECF No. 38-2, p. 122.

On June 10, 2020, a PIRTEK representative received a letter from Mr. Jerry Marks ("**Mr.**

**Marks**"), legal counsel to Mr. Lager, claiming that PIRTEK was engaging in a tortious or

deceptive business practice by impersonating itself to the Defendants' customers as though

Defendants' businesses were PIRTEK affiliates. ECF No. 38-2, pp. 10, 17–18. On the same day,

a separate letter reached the same representative, this time claiming that PIRTEK was

misrepresenting itself "as being endorsed by JBL Hose Service and James Lager," and to

immediately cease and desist or legal action would be taken against PIRTEK. *Id.* at pp. 20–21. On

July 1, 2020, Mr. Marks sent an e-mail to PIRTEK's counsel demanding damages of

$9,000,000.00 for various "wrongs done to Jim Lager." ECF No. 38-2, pp. 23–26. Notably, the e-

3

mail threatened the release of a book and a website that would "destroy any domestic and worldwide franchise hopes [PIRTEK] had to expand it[s] brand." *Id.* at p. 23. Following receipt of the e-mail, PIRTEK and Mr. Lager agreed to participate in mediation. ECF No. 38-1, p. 11, ¶ 17. The result of the mediation was that the Parties entered into a further Settlement and Mutual Release Agreement (the "**Second Settlement**") dated September 2, 2020, that superseded the First Settlement. ECF No. 38-1, p. 11, ¶ 17; ECF No. 38-2, pp. 137–152.

Like the First Settlement, the Second Settlement contained a non-disparagement clause, which functioned to restrict the Parties and their representatives or employees from engaging "in any disparaging communication or statement (whether verbal, written, online (including on unhappyfranchisee.com) or through any social media platform[.])" ECF No. 38-3, p. 291. The Second Settlement contained restrictive language that restrained Mr. Lager, his companies, and any legal counsel he retained, even through or in concert with third Parties, from engaging "in any communication" or making "any statement regarding, describing, commenting upon or referencing [PIRTEK]" in a disparaging manner. *Id*. In exchange for their assent to these restrictions, the Defendants were provided with certain financial benefits. For instance, the Parties agreed that the amounts due to PIRTEK pursuant to the First Settlement would be waived so long as Mr. Lager complied with the terms of the Second Settlement. ECF No. 38-2, p. 135. The Second Settlement also required PIRTEK to pay $300,000.00 to the Defendants. ECF No. 38-3, p. 288. Notably, the Second Settlement contained an all-encompassing confidentiality provision preventing the Parties from disclosing the existence or terms of the Second Settlement. *Id.* at p. 296.

On September 30, 2020, less than four weeks after executing the Second Settlement, Mr. Lager sent an e-mail to Mr. Sean Kelly ("**Mr. Kelly**"), the owner of unhappyfranchisee.com, attaching a copy of the Second Settlement. ECF No. 38-3, p. 154; ECF No. 38-4, pp. 1-18. In an

April 15, 2021, e-mail, Mr. Lager proposed to commit to Mr. Kelly a portion of any legal recovery Mr. Lager received from legal actions against PIRTEK, with the stated motivation that Mr. Lager desired to move into a financial position that would allow he and Mr. Kelly to "write [their] book." ECF No. 38-2, pp. 111-113; ECF No. 38-4, p. 20. On June 28, 2021, PIRTEK initiated arbitration (the "**Arbitration**") against the Defendants by filing a Statement of Claim.[4] ECF No. 38-2, p. 11, ¶ 20.

On June 19, 2021, Mr. Lager published a post on his LinkedIn profile stating that his franchise agreement was not renewed because he was "dating a Black woman named Blessing," and that he "no longer fit the white franchise poster boy." ECF No. 38-3, p. 153; ECF No. 38-4, pp. 34-35. One week later, on June 26, 2021, Mr. Lager published another post on LinkedIn wherein he wrote that he "nearly lost everything because [he] dated a woman that white franchise leadership considered [to have] a prostitute's name." ECF No. 38-3, p. 3; ECF No. 38-4, p. 37. The next day, Mr. Lager posted again on LinkedIn, discussing his liberation from the "oppressive behavior of franchising" and "indentured servitude." ECF No. 38-3, p. 7; ECF No. 38-4, p. 39. On July 21, 2021, Mr. Lager posted again on LinkedIn, this time disclosing that when his franchise agreements were terminated, he signed an "NDA." ECF No. 38-3, pp. 12-13; ECF No. 38-4, p. 50. On November 29, 2021, Mr. Lager sent another e-mail to Mr. Kelly, attaching portions of the Second Settlement and requesting him to take some action "in an unnamed manner." ECF No. 38-4, pp. 22-27.

On December 22, 2021, Mr. Lager sent an e-mail to the Arbitrator requesting approval of a draft of a letter he wanted to submit to the North American Securities Administrators Association ("**NASAA**"). ECF No. 38-4, pp. 77–78; ECF No. 38-5, pp. 1–2; ECF No. 38-3, p. 24. The next

---

[4] The Second Settlement provides for all disputes to be resolved by arbitration. [ECF No. 38-4, pp. 14–15]. The Parties designated David Kaufmann as the arbitrator (the "**Arbitrator**").

day, the Arbitrator entered a temporary restraining order (the "**TRO**") prohibiting Mr. Lager from sending the proposed letter to NASAA. ECF No. 38-5, p. 4. The same day, Mr. Lager added another post to his LinkedIn account declaring that the Defendants were no longer affiliated with PIRTEK, bemoaning the existence of an article on a website entitled "1851franchise.com" discussing his military service and "success with PIRTEK." ECF No. 38-5, pp. 16–17. In a reply to a comment on the same post, Mr. Lager states that PIRTEK is using "my story[,] my success [and] my valor to sell franchises," and implies that doing so is "[a] complete breach of our contract dated September 2, 2020." *Id.*; ECF No. 38-3, pp. 28–29.

On December 28, 2021, Mr. Lager sent a letter to NASAA (the "**NASAA Letter**") in violation of the TRO. ECF No. 38-5, pp. 6–7. The NASAA Letter states that Mr. Lager had a "negative franchise experience" and was "defrauded" while he was a franchisee. *Id.* When Mr. Lager received a response from NASAA via e-mail, he encouraged NASAA to publish his letter on its website. ECF No. 38-5, pp. 9–10. The same day, Mr. Lager filed complaints regarding PIRTEK and an executive of PIRTEK with the Federal Trade Commission (the "**FTC**") and the American Civil Liberties Union of Texas (the "**ACLU**"). ECF No. 38-5, pp. 19–27. In his complaint to the FTC (the "**FTC Complaint**"), Mr. Lager states again that he had a "negative experience" while he was a franchisee, and that he was "defrauded." ECF No. 38-5, p. 19. In his complaint to the ACLU (the "**ACLU Complaint**"), Mr. Lager states that a specific PIRTEK executive made "racist comments" about Mr. Lager's girlfriend, and that Mr. Lager was found by PIRTEK to be "unsuitable" to its "all-white company." ECF No. 38-5, p. 25.

On or about January 4, 2022, Mr. Lager posted again on his LinkedIn account, this time linking to an article from Mr. Kelly's website, unhappyfranchisee.com, entitled "Is PIRTEK USA Racist? Or Just Really, Really White – Unhappy Franchisee." ECF No. 38-3, pp. 52–53; ECF No.

38-5, p. 53. Mr. Lager's post includes a specific reference to the Second Settlement. ECF No. 38-5, p. 53. Three days later, Mr. Lager sent an e-mail to Mr. Kelly asking him to post a presentation to his website entitled "PIRTEK USA's Racist Owner is Attempting to Destroy Their Former Top Franchisee. But With the Rising Intolerance of Institutional Prejudice, Will Racism Destroy PIRTEK USA Instead?" ECF No. 38-5, pp. 57–77. The presentation contained approximately nineteen pages of narrative explanation detailing Mr. Lager's personal history and his experience as a PIRTEK franchisee, however interwoven throughout are allegations of racism and other generally negative commentary about the company and its executives. *Id.* Later in January of 2022, Mr. Lager posted to LinkedIn, posing a question about images included in the post: "Pirtek! Why do you think this woman is a prostitute?" ECF No. 38-6, p. 6. In the comments section to the post, Mr. Lager specifically references PIRTEK executives Glenn Duncan and Kim Gubera by name. ECF No. 38-6, p. 7.

On January 26, 2022, Mr. Lager sent Mr. Kelly an e-mail proposing to mail a letter to "every franchisee." ECF No. 38-6, p. 9. The proposed letter was contained in the body of an e-mail sent to Mr. Kelly earlier that day, and it contained references to the Second Settlement, the Arbitration, and further allegations of racism by PIRTEK executives, even going so far as to claim that Mr. Lager possessed phone recordings of a PIRTEK vendor and manager describing Mr. Lager's girlfriend as a prostitute. ECF No. 38-6, pp. 9–10. In February of 2022, Mr. Lager posted several more times to his LinkedIn page, at times describing PIRTEK as a "bad actor" or having "a racist secret," other times mentioning the Second Settlement, its terms, and Glenn Duncan or Kim Gubera, if not both. ECF No. 38-3, pp. 65–74; ECF No. 38-6, pp. 12–22.

On January 17, 2022, Mr. Lager filed a voluntary petition commencing the Main Bankruptcy Case. ECF No. 46, p. 44. The next day, shortly prior to what was scheduled to be the

final hearing in the Arbitration at 10:00 a.m., the Defendants informed the Arbitrator and PIRTEK of Mr. Lager's bankruptcy filing by having their legal counsel send a Suggestion of Bankruptcy. ECF No. 38-1, pp. 9–10; ECF No. 46, p. 45. Despite the notice that Mr. Lager was in bankruptcy, PIRTEK advised the Defendants and the Arbitrator that they would still be proceeding in the Arbitration against JBL, as PIRTEK did not believe JBL was protected by the Automatic Stay. ECF No. 46, pp. 45, 48–50. Based on this information, the Arbitrator e-mailed the Defendants' legal counsel in order to invite them to join the hearing as soon as possible unless they could "cite law" showing that JBL was protected by the automatic stay and that the Arbitration was stayed. ECF No. 46, p. 48. The Defendants replied, citing case law they believed stood for the proposition that the automatic stay should apply to a non-debtor if the claim against the non-debtor would have immediate adverse economic consequence for the debtor's estate. *Id.* Regardless, the Arbitrator commenced the final hearing at 10:15 a.m. and PIRTEK pursued its claims against JBL without participation from Mr. Lager or JBL. *Id.*

On January 20, 2022, PIRTEK's counsel submitted via e-mail a proposed "Final Arbitration Award" (the "**Arbitration Award**"), to the Arbitrator, copying the Defendants' legal counsel. ECF No. 46, pp. 53–54. The next day, Mr. Lager's bankruptcy counsel, Ms. Melissa Hayward, replied to the e-mail objecting to the proposed Arbitration Award on the basis that moving forward in the Arbitration had been a violation of the automatic stay imposed by Mr. Lager's bankruptcy filing. ECF No. 46, p. 52. The same day, PIRTEK's legal counsel replied to Ms. Hayward's e-mail stating that PIRTEK did not believe it was in violation of the automatic stay simply by pursuing a suit against non-debtor entities. ECF No. 46, pp. 56–57. On Sunday afternoon, two days later, Ms. Hayward replied to PIRTEK's counsel, clarifying that the violation of the stay pertained to section 362(a)(3) of the Bankruptcy Code, not section 362(a)(1), and cited

to caselaw supporting Mr. Lager's position. ECF No. 46, p. 56. The next day, PIRTEK's counsel replied to Ms. Hayward's e-mail, copying the Arbitrator thereon and requesting that he wait before entering the proposed Arbitration Award until they could better research the issue and consult with their client. ECF No. 46, p. 62. Two days later, PIRTEK requested that the Arbitrator hold any further action until the Bankruptcy Court could rule on whether the stay applied. ECF No. 46, p. 68.

Six weeks after Mr. Lager's initial bankruptcy petition, JBL subsequently filed for bankruptcy on March 10, 2022.[5] The next day, JBL filed its *Motion for Order Directing Procedural Joint Administration of Affiliated Debtors Pursuant to Section 105(a) and Rule 105* at ECF No. 11 in the JBL Case. At a hearing on March 12, 2022, the Court granted the motion as it was unopposed. On April 26, 2022, PIRTEK filed its Complaint commencing the Adversary Proceeding. ECF No. 1. The Complaint was amended on May 25, 2022. ECF No. 14. On May 31, 2022, Defendants moved to dismiss the Amended Complaint. ECF No. 18. On July 6, 2022, the Court held a hearing on the Motion to Dismiss and took the matter under advisement before issuing its *Memorandum Opinion and Order Denying Defendant's Motion to Dismiss Plaintiff's Complaint* (the "**Order Denying Dismissal**") on August 11, 2022. ECF No. 25.

On August 25, 2022, the Defendants filed their *Answer, Affirmative Defenses and Counterclaims* (the "**Answer**"). ECF No. 28. On September 15, 2022, PIRTEK filed its *Answer and Affirmative Defenses to Counterclaim*. ECF No. 32. Approximately four months later, PIRTEK filed its MSJ on January 20, 2023. ECF No. 38. On February 18, 2023, the Defendants filed their *Response to Plaintiff's Motion for Summary Judgment* (the "**Response**"), requesting

---

[5] *See* ECF No. 1 in Bankruptcy Case No. 22-30439-MVL11.

that the Court deny the Plaintiff's MSJ. [6] ECF No. 44. The Defendants filed their *Brief in Support of Defendants' Response to Plaintiff's Motion for Summary Judgment* and *Appendix of Exhibits in Support of Defendants' Response to Plaintiff's Motion for Summary Judgment* in conjunction with the Response. ECF Nos. 45, 46. PIRTEK filed its *Reply in Support of Motion for Summary Judgment* (the "**Reply**") on March 3, 2023. ECF No. 52. This Court held a hearing on the MSJ on March 21, 2023, to which counsel for both Parties appeared and presented oral arguments on the Motion.

At the hearing on the MSJ, the Court also specifically heard oral arguments on the Defendants' objections to certain items that PIRTEK had submitted in support of its MSJ as summary judgment evidence. Defendants specifically objected to the inclusion of eight separate articles (or portions thereof) from unhappyfranchisee.com under Rule 56(c)(2), made applicable to this Adversary Proceeding by Bankruptcy Rule 7056. [7] The Defendants argued that these eight articles should be excluded from the summary judgment record on the basis that they "cannot be presented in a form that would be admissible in evidence" because they are unauthenticated or lack self-authentication. ECF No. 45, p. 6.

Plaintiffs' only response was to argue that PIRTEK was not offering the articles for the purpose of proving the truth of the defamatory statements allegedly made within them, but instead simply to show that the statements were made. *See* ECF No. 52, pp. 10–11. In support of this argument, Plaintiff cited to *Jauch v. Corley*, a Fifth Circuit case from 1987 which allowed the admission of a newspaper article on the basis cited above. 830 F.2d 47, 52 (5th Cir. 1987).

---

[6] In the Response, the Defendants objected to eight exhibits to the Plaintiff's MSJ that had been cited as summary judgment evidence. *See* ECF No. 45, pp. 5–7.
[7] Hereinafter, all capitalized references to a "Rule" are made in reference to the Federal Rules of Civil Procedure (the "**Rules**"), and all capitalized references to a "Bankruptcy Rule" are made in reference to the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

However, the Court will note that in *Jauch v. Corley*, the disputed piece of evidence was a newspaper, which is a self-authenticating piece of evidence. *Id.* That is not the case for the unhappyfranchisee.com articles cited to by Defendants.

A party "properly supports a fact by citing to competent summary judgment evidence, but unauthenticated documents are not competent evidence." *Garcia v. U Pull It Auto & Truck Salvage, Inc.*, No. 3:14-cv-3655-BN, 2016 U.S. Dist. LEXIS 13349, at *2 (N.D. Tex. Feb. 4, 2016) (citing *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994)). However, the Fifth Circuit has also held that "although the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible …, the material may be presented in a form that would not, in itself, be admissible at trial." *Lee v. Offshore Logistical and Transport, L.L.C.*, 859 F.3d 353, 355 (5th Cir. 2017) (quoting 11 Moore's Federal Practice–Civil ¶ 56.91 (2017)).

After hearing oral arguments on both the MSJ as a whole and the objections to certain portions of the record as summary judgment evidence, the Court took the matter under advisement. As a matter of efficiency, the Court will only take up the objections to evidence on which the Court relies in making its decision on Plaintiff's MSJ.

On June 15, 2023, the Plaintiff filed a *Motion for Leave to File Supplemental Evidence in Support of Motion for Summary Judgment* (the "**Motion to Supplement**"). ECF No. 59. The Plaintiff sought leave to supplement the summary judgment record with the submission of four articles recently posted to unhappyfranchisee.com in June of 2023, each of which discussed PIRTEK and the instant Adversary Proceeding. *See* ECF No. 59, p. 5. On June 26, 2023, the Defendants responded by filing their *Response in Opposition to Plaintiff's Motion for Leave to File Supplemental Evidence in Support of Motion for Summary Judgment*, which included a number of exhibits in opposition to the Motion to Supplement. The Defendants objected to the

Motion to Supplement on the basis that the articles cited to by PIRTEK were not relevant to the MSJ, because Mr. Lager had neither a hand in drafting them nor any knowledge of Mr. Kelly's intention to post them. *See* ECF No. 61, p. 6. The Defendants also argued that even though they pay Mr. Kelly's company, IdeaFarm, $5,000.00 per month for "marketing services," they have no control over Mr. Kelly's publishing activities on the unhappyfranchisee.com website, arguing that he is an independent journalist. *Id.* at 7.

On June 27, 2023, the Court held a hearing on the Motion to Supplement to which both Parties appeared. After hearing oral argument from both Parties, the Court rendered an oral ruling granting the Motion to Supplement. The Court admitted the evidence submitted by both Parties in support of their respective briefs on the Motion to Supplement as supplemental summary judgment evidence in accordance with L.B.R. 7056-1(g). *See, e.g.,* ECF Nos. 59 and 61.

### III.   SUMMARY JUDGMENT STANDARD.

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56, as made applicable by FED. R. BANKR. P. 7056; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

When the moving party has carried its burden under Rule 56(c), its opponent must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec.*

*Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538

(1986). To avoid summary judgment, the nonmovant must set forth specific facts, by affidavits or

otherwise, showing that there is a genuine issue for trial. *Topalian v. Ehrman*, 954 F.2d 1125, 1132

(5th Cir. 1992). Only where the record taken as a whole could not lead a rational trier of fact to

find for the nonmoving party is there no "genuine issue for trial." *Scott v. Harris*, 550 U.S. 372,

380, 127 S.Ct.1769, 167 L.Ed.2d 686 (2007).

In accordance with this standard, after considering the extensive briefing of the Parties, the

undisputed facts as laid out above, and the oral arguments of counsel to both Parties, the Court

concludes that the MSJ should be granted in part and denied in part.

## IV. LEGAL ANALYSIS.

### A. Breach of Contract

PIRTEK seeks summary judgment on its breach of contract claims, specifically Counts I

and II of its Amended Complaint because, it alleges, the undisputed facts firmly establish each

element of its breach of contract claims. Under Florida law, which governs according to the choice-

of-law provision in the Second Settlement [ECF No. 38-3, p. 150], a plaintiff must generally prove

three elements on a breach of contract claim: (1) the existence of a contract; (2) a material breach;

and (3) damages resulting from the breach. *See Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272

(11th Cir. 2009). The Defendants argue that PIRTEK has failed to meet its burden to show that

there is no issue of material fact for trial on each element of this cause of action. The Defendants

specifically argue that summary judgment should be denied because PIRTEK has failed to prove

(1) that PIRTEK did not first breach the contract, which would have excused Mr. Lager's

obligations under the Second Settlement, and (2) that the restrictive covenants in the Second

Settlement are enforceable under Florida law. The Court, for the reasons enumerated below, finds that PIRTEK is entitled to summary judgment on its breach of contract claims.

### 1.  Existence of a Contract

It is beyond reasonable dispute that a contract existed between the Parties. PIRTEK and the Defendants each assert claims for breach of the Second Settlement, which presupposes the existence of a valid contract. ECF No. 14, pp. 33–37; ECF No. 28, pp. 22–23. Furthermore, the declarations of both Mr. Lager and Ms. Kim Gubera establish that each Party was aware of the existence and validity of the Second Settlement. ECF No. 38-2, p. 11, ¶ 17; ECF No. 46, p. 7, ¶¶ 11–17. As such, the Court finds that the first element is established as a matter of law, and that there is no genuine issue of material fact regarding the existence of a contract.

### 2.  Material Breach

It is also beyond reasonable dispute that Mr. Lager materially breached the terms of the Second Settlement by taking numerous affirmative actions in violation of the non-disparagement and confidentiality provisions. Under Florida law, a "material breach" is one that goes "to the essence of the contract, as opposed to the mere failure to perform some minor part of the contract." *Hamilton v. Suntrust Mortg. Inc.*, 6 F.Supp.3d 1300, 1309 (S.D. Fla 2014) (citations omitted) (quoting *Covelli Family, L.P. v. ABG5, L.L.C.*, 977 So.2d 749, 752 (Fla. 4th DCA 2008)). Specifically, a party's failure to perform "some minor part of his contractual duty" should not be classified as a "material or vital breach." *See Beefy Trail, Inc. v. Beefy King Intern., Inc.*, 267 So.2d 853, 857 (Fla. 4th DCA 1972) (citing CORBIN ON CONTRACTS, Vol. 5, § 1104, pp. 562–65).

The Defendants make no effort to dispute PIRTEK's argument that Mr. Lager's conduct materially breached the non-disparagement provisions of the Second Settlement. *See* ECF Nos. 28, 45. The summary judgment record is replete with instances of Mr. Lager intentionally,

blatantly disparaging PIRTEK on LinkedIn, and Mr. Lager acknowledges that he understood his posts and communications were harmful to PIRTEK in his sworn deposition testimony. ECF No. 38-3, p. 52. Mr. Lager also materially breached the confidentiality provisions of the Second Settlement multiple times in e-mails to Mr. Kelly, in LinkedIn posts, and in complaints to NASAA, the FTC, and the ACLU.[8] Mr. Lager admits during his deposition testimony that he knew that the confidentiality provision within the Second Settlement required him to keep the existence and terms of the Second Settlement confidential from the day it was entered. ECF No. 38-3, p. 69. As such, there is no issue of material fact about whether Mr. Lager took actions that constituted a material breach of the Second Settlement.

Instead, the Defendants argue (1) Mr. Lager was excused from performance of the Second Settlement by PIRTEK's prior material breach of the agreement, and (2) that the confidentiality and non-disparagement provisions of the Second Settlement are unenforceable under Florida law. The Court will first analyze the Defendants' affirmative defense of prior material breach before turning to whether the provisions of the Second Settlement were enforceable.

### i. Prior Material Breach

In the Defendants' Answer, the Defendants assert the affirmative defense of prior material breach, which is similarly incorporated into their counterclaim for breach of the Second Settlement. ECF No. 28, pp. 18, 22–23. Under Florida law, "having committed the first breach, the general rule is that a material breach of the agreement allows the non-breaching party to treat the breach as a discharge of his contractual liability." *Colucci v. Kar Kare Auto. Group, Inc.*, 918 So. 2d 431, 437 (Fla. 4th DCA 2006) (quoting *Benemerito & Flores, M.D.'s, P.A. v. Roche, M.D.*, 751 So. 2d 91, 93 (Fla. 4th DCA 1999)). The Defendants argue that PIRTEK violated Section 5(f)

---

[8] *See, e.g.*, ECF No. 38-4, pp. 22–27, 32, 50, 52; *see also, e.g.*, ECF No. 38-5, pp. 6–7, 9, 17, 22–27, 53, 57–77; ECF No. 38-6, pp. 6, 9–10, 12–13, 15, 17, 22, 24.

of the Second Settlement. The Defendants believe Section 5(f) of the Second Settlement prohibited PIRTEK from referencing "[the Defendants] on any Pirtek webpage, Pirtek promotional material, any Pirtek social media post (including but not limited to on Pirtek's website, on LinkedIn, Facebook, Twitter, or any other online media) or in Pirtek's print media." ECF No. 45, p. 18, ¶ 61. The Defendants go on to argue that Section 5(f) places no time limitation, upload date, or any other limitation on "PIRTEK's obligation." *Id.* Furthermore, they state that "[t]he evidence establishes that dozens of websites containing information uploaded or approved of by PIRTEK were still active." *Id.* at ¶ 62. Finally, they argue that "PIRTEK recognized its obligations to take posts down yet were unable to." *Id.*

PIRTEK claims that while Section 5 of the Second Settlement imposed certain ***prospective*** obligations on both parties, nothing in Section 5(f) imposed an affirmative obligation to ***remove pre-existing*** references to Mr. Lager or JBL from the internet. ECF No. 38-1, pp. 51–52. Instead, Plaintiff points out that the plain language of Section 5 of the Second Settlement solely requires PIRTEK to refrain from any ***future*** conduct or communications of the type prohibited by Section 5(f). ECF No. 38-3, p. 141. Plaintiff also argues that the incongruity in the Defendants' interpretation of Section 5(f) is made plain by the existence of a separate section in the Second Settlement that imposes the distinct obligation (on only the Defendants) to remove pre-existing internet content, Section 7(e). The Court agrees with the Plaintiff's interpretation.

The construction and enforcement of a settlement agreement is governed by principles of Florida's general contract law. *See Schwartz v. Florida Bd. of Regents*, 807 F.2d 901, 905 (11th Cir. 1987). Absent ambiguity, interpretation of a contract is a question of law to be decided by the court. *See Schwartz*, 807 F.2d at 905 (citing to *Turner v. Orr*, 759 F.2d 817, 821 (11th Cir. 1985)). Under Florida law, "[c]ontract interpretation begins with a review of the plain language of the

agreement because the contract language is the best evidence of the parties' intent at the time of the execution of the contract." *Caracol Television S.A. v. Telemundo Television Studios, LLC*, No. 21-10515, 2022 WL 202546, at *3 (11th Cir. Jan. 24, 2022) (citing to *Taylor v. Taylor*, 1 So.3d 348, 350 (Fla. Dist. Ct. App. 2009) (per curiam)). "The court's role is to determine the intention of the parties from the language of the agreement, the apparent objects to be accomplished, other provisions in the agreement that cast light on the question, and the circumstances prevailing at the time of the agreement." *Schwartz*, 807 F.2d at 905-06 (citing *J&S Coin Operated Machines, Inc. v. Gottlieb*, 362 So.2d 38, 39 (Fla. 3d DCA 1978)).

Section 5 of the Second Settlement is entitled "Permissible Communications with Customers and Potential Customers for Commercial Competitive Purposes." ECF No. 38-3, p. 140. The section outlines and defines what communications, references and statements would be acceptable for the Parties "to engage in" during the "ordinary course" of "serving existing or potential customers" for the specific purpose of *comparing* "PIRTEK's products and services with the products and services offered by the Lager Companies." *Id.* Sub-sections 5(a)–(k) list examples of communications or references that *would not be* permitted under the above specifications. *Id.* at 140–41. Specifically, Section 5(f) prevents PIRTEK from engaging in any *future communications* that could be considered:

> References to Lager or any Lager Party on any PIRTEK webpage, PIRTEK promotional materials, any PIRTEK social media post (including but not limited to on PIRTEK's website, on LinkedIn, Facebook, twitter, or any other online media) or in PIRTEK print media.

ECF No. 38-3, p. 141. In the same way, Section 5(e) prevented the Defendants from engaging in any *future* communications that could be considered:

> References to PIRTEK or any PIRTEK Party on any Lager Party webpage, promotional materials or in any social media post (including but not limited to on

Texas Hose Pro's website, on LinkedIn, Facebook, twitter, or any other online media, including unhappyfranchisee.com), or in print media.

*Id.*

The Defendants argue that under Florida law, the Parties' intentions are determined by the contract as a whole. ECF No. 45, p. 18, ¶ 63. The Court agrees. The Court finds it instructive that Section 5 does not, in any way, discuss ***past*** communications or ***presently existing*** statements and publications on the internet. Rather, Section 5 simply discusses the Parties' obligations regarding "ordinary course of business" communications ***going forward***. In contrast, Section 7(e) imposes a specific affirmative obligation on ***only*** the Defendants to remove ***presently existing*** materials:

> Within 5 days of the Effective Date [the Defendants] will take all steps reasonably available to them to (i) ***remove all presently existing*** communications and/or statements made by [Defendants] which reference or identify any PIRTEK Party, whether expressly or by inference, from all online forums which any [Defendant] controls (e.g., [Mr. Lager]'s LinkedIn page, Texas Hose Pro's website, Twitter, Facebook, etc.); (ii) request removal of such content from third-party forums or websites not controlled by any Lager Party; and (iii) remove and all tags, likes forwards and comments Lager made on any third-party websites (including without limitation unhappyfranchisee.com); provided, however, the [Defendants] shall not be required to move any complimentary references, posts, social media, etc. made by any [Defendant] when he was a PIRTEK franchisee. In the event PIRTEK does not believe the [Defendants] have complied with this obligation, PIRTEK shall provide the [Defendants] with written notice (identifying with specificity, the location of the allegedly unremoved communication(s) and/or statement(s)) and opportunity to cure with 3 days of any such notice by PIRTEK prior to the [Defendants] being deemed in breach of this Section.

ECF No. 38-3, p. 144 (emphasis added). The language of Section 7(e) is decidedly different from that of Section 5. For instance, (1) Section 7(e) contains a specific time frame for the required action; (2) the actions required by Section 7(e) are affirmatively stated (e.g., "remove all presently existing communications" or "request removal of such content"); and (3) Section 7(e) provides PIRTEK an avenue for redress in the event the Defendants have failed to comply with its requirements. *Id.* Giving credence to the Defendants' argument would render Section 7(e)

superfluous at best and, in the extreme, rewrite the terms of Section 7(e) to be mutual. *See Kel Homes, LLC v. Burris*, 933 So.2d 699, 703 (Fla. 2d DCA 2006) ("[I]t is a general principle of contract interpretation that a specific provision dealing with a particular subject will control over a different provision dealing only generally with that same subject.").

The Defendants further argue that evidence showing that PIRTEK took steps to remove postings referencing the Defendants on its website and other third-party websites demonstrates that PIRTEK believed the Second Settlement to require it to take such actions. ECF No. 45, p. 18–19. For this proposition, the Defendants cite to Florida case law holding that the parties to a contract's subsequent actions may be considered as a means of determining the interpretation that they themselves have placed on the contract. ECF No. 45, p. 18, ¶ 63. However, the Defendants' logic skips an important step.

Florida law specifically requires that "before extrinsic matters may be considered by a court in interpreting a contract, the words used on the face of the contract must be ambiguous or unclear." *See Caracol Television*, 2022 WL 202546 at *3 (citing to *Acceleration Nat'l Serv. Corp. v. Brickell Fin. Servs. Motor Club, Inc.*, 541 So.2d 738, 739 (Fla. 3d DCA 1989) (per curiam)). "The mere fact that [plaintiff] says the term is ambiguous does not make it so. Likewise, [plaintiff's] ability to assert a different interpretation does not mean the term is ambiguous[.]" *Katchmore Luhrs, LLC v. Allianz Global Corp.*, No. 15-23420, 2017 WL 201840, at *6 (S.D. Fla. Jan. 18, 2017).[9]

In the instant case, the Court finds that the terms of Section 5 of the Second Settlement are unambiguous. Defendants' entire argument for prior material breach rests on an interpretation of Section 5(f) which is not reasonable when viewed in light of the contract as a whole. The supposed

---

[9] The Eleventh Circuit has held that "while a contract is ambiguous if it is 'susceptible to two different interpretations, each one of which is reasonably inferred from the terms of the contract,' a party's interpretation of the contract that is unreasonable in light of the contract's plain language does not make the contract ambiguous." *Caracol Television*, 2022 WL 202546 at *3 (citing to *Frulla v. CRA Holdings, Inc.*, 543 F.3d 1252, 1253 (11th Cir. 2008).

breaches by PIRTEK stem from pre-existing internet posts and articles discussing the Defendants'

prior franchise relationship with PIRTEK which "*remained* on [PIRTEK's] webpages or social

media sites which [PIRTEK] had control or access to." ECF No. 38-1, p. 52. Nothing in the terms

of Section 5 *requires* PIRTEK to affirmatively *remove* references to Mr. Lager or JBL from its

own website or any other. Similarly, nothing in the Second Settlement functions to *prevent*

PIRTEK from removing any posts, articles, or other references to the Defendants from its website

or seeking to have such removed from third-party websites. As such, the Court rejects the

Defendants' argument that PIRTEK's actions after the execution of the Second Settlement

establish a different obligation in the Second Settlement than that required by its plain language.[10]

The Court therefore finds that Defendants' affirmative defense for prior material breach

and the Defendants' counterclaim Count I for breach of the Second Settlement both fail as a matter

of law. The Court will now turn to the issue of whether the non-disparagement and confidentiality

clauses of the Second Settlement are enforceable under Florida Law.

*ii. Enforceability of Restrictive Covenants*

The Parties agree that Florida law governs the terms of the Second Settlement. ECF No.

38-1, p. 59; ECF No. 45, p. 16. The disagreement between the Parties is whether the non-

disparagement and confidentiality clauses at issue are enforceable, or as the Defendants argue,

constitute unreasonable restraints of trade or commerce and therefore unenforceable as restrictive

---

[10] Although the Court need not reach materiality, the argument that PIRTEK's failure to take down historical references to its prior franchisee that were made in a favorable light seems a bit contrived. Likewise, based on the summary judgment record, the Court can discern no evidence showing that the Defendants were specifically aware of any legacy PIRTEK posts before breaching the Second Settlement themselves only 28 days after entry into the same. *See, e.g.,* ECF No. 38-3, p. 154; ECF No. 38-4, p. 1–18. Furthermore, even if the Second Settlement were to impose an affirmative obligation on PIRTEK to remove prior references to Defendants, the Court is plainly doubtful that the instances of supposed breach referenced by the Defendants would constitute a *material* breach under Florida law, because the Court believes that the most material portion of PIRTEK's obligation under the Second Settlement relates to its payment terms. *See Beefy Trail*, 267 So.2d at 857 (discussing how a material breach is one that goes to the "essence of a contract," and that a party's failure to perform "some minor part of his contractual duty" should not be classified as a material or vital breach).

covenants under Florida Statutes §§ 542.18 and 542.335. ECF No. 45, pp. 16–17. Defendants argue that PIRTEK failed to fulfill its burden under Florida law to "plead and prove" a "legitimate business interest" justifying the non-disparagement and confidentiality clauses of the Second Settlement; and thus PIRTEK's restrictive covenants are unenforceable such that Defendants could not have materially breached the Second Settlement by violating them. ECF No. 45, p. 16. PIRTEK posits that the restrictive covenants in the Second Settlement were necessary to protect against a loss of customer goodwill due to the disparaging efforts of the Defendants. ECF No. 52, p. 11–13.

Florida law restricts the enforceability of restrictive covenants. *See* FLA. STAT. §§ 542.18, 542.335. As such, Florida law "contains a comprehensive framework for analyzing, evaluating and enforcing restrictive covenants[.]" *See Vital Pharmaceuticals, Inc. v. Alfieri*, 23 F.4th 1282, 1291 (11th Cir. 2022) (citing to *Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1230–31 (11th Cir. 2009)). For a restrictive covenant to be valid: (1) the restrictive covenant must be "set forth in a writing signed by the person against whom enforcement is sought"; (2) the party seeking to enforce the restrictive covenant "shall ***plead and prove the existence*** of one or more legitimate business interests justifying the restrictive covenant"; and (3) the party seeking to enforce the restrictive covenant "shall ***plead and prove*** that the contractually specified restraint is ***reasonably necessary to protect*** the legitimate business interest or interests justifying the restriction." *See* FLA. STAT. § 542.335(1)(a)–(c) (emphasis added). "Any restrictive covenant not supported by a legitimate business interest is unlawful and is void and unenforceable." FLA. STAT. § 542.335(1)(b). Furthermore, courts are commanded by the statute to "grant only the relief reasonably necessary to protect such interest." *See White v. Mederi Caretenders Visiting Services of Southeast Florida, LLC*, 226 So.3d 774, 785 (Fla. 2017) (citing to FLA. STAT. § 542.335(1)(c)).

PIRTEK argues that Defendants' challenge to the enforceability of the restrictive covenants is an "unpled defense" of "failure to state a claim[.]" ECF No. 52, pp. 11–12. However, the Plaintiff bears the burden of proving each element of its cause of action. In *Rauch, Weaver, Norfleet, Kurtz & Co., Inc. v. AJP Pine Island Warehouses, Inc.*, the Eleventh Circuit spelled out that the "section 542.335 factors are not affirmative defenses in an action for breach of contract based on an alleged violation of a restrictive covenant[;]" rather, "the threshold requirements of section 542.335 are an essential element in any cause of action concerning enforcement of a restrictive covenant." 313 So.3d 625, 631 (11th Cir. 2021). As such, the Court rejects Plaintiff's argument that enforceability was an unpled defense.

Next, PIRTEK argues that the restrictive covenants should be enforceable as they are necessary for the protection of its reputation and to prevent a "loss of customer goodwill" threatened by the Defendants' continued disparagement of PIRTEK. ECF No. 52, p. 13. The Eleventh Circuit has held that "the determination of whether an activity qualifies as a protected legitimate business interest under the statute is inherently a factual inquiry, which is heavily industry and context-specific." *White*, 226 So.3d at 786; *see also First Financial Education Centers LLC v. Ziegler Group, LLC*, No. 3:21-cv-157-MMH-MCR, 2021 WL 7450436, at *12 (M.D. Fla. Nov. 19, 2021) (citing to *Genterra Grp., LLC v. Sanitas USA, Inc.*, No. 20-22402-Civ-Scola, 2021 WL 148887, at *4 (S.D. Fla. Jan. 15, 2021)). "The fact that [customer goodwill] ***can*** constitute a legitimate business interest does not automatically satisfy all factual issues." *White*, 226 So.3d at 786 (emphasis in original). Instead, the Eleventh Circuit held that trial courts should determine the legitimacy of a particular business interest "in conjunction with the industry context and evidence adduced." *Id.*

In the instant case, although Plaintiff states conclusively that the Second Settlement's restrictive covenants were necessary to protect PIRTEK's reputation and preserve customer goodwill, the Defendants note that the Plaintiff does not cite to any evidence within the summary judgment record to specifically support its argument that the loss of customer goodwill is a legitimate business interest justifying the enforceability of its restrictive covenants in the Second Settlement. In Florida, "customer goodwill associated with an ongoing business by way of trade name or trademark" is specifically enumerated as a legitimate business interest under section 542.335. *See* FLA. STAT. § 542.335(1)(b). The Court will also note that Florida law extends a "legal guarantee of present enjoyment of goodwill" to businesses.[11] A plaintiff in Florida "may recover actual damages caused by a defendant's disparaging comments made about the plaintiff's business which are of a kind calculated to prevent others from dealing with the plaintiff." *Marrero*, 625 F.2d at 515; *see also, e.g., Continental Development Corp. of Florida v. Duval Title & Abstract Co.*, 356 So.2d 925 (Fla. Dist. Ct. App. 1978); *Kilgore Ace Hardware, Inc. v. Newsome*, 352 So.2d 918 (Fla. Dist. Ct. App. 1977).

In its Order Denying Dismissal, the Court noted that Mr. Lager is not a layman in his industry,[12] inferring that Mr. Lager not only understood the potential consequences of accusing another business of racially discriminatory practices but intended such accusations to harm the Plaintiff's reputation. ECF No. 25, pp. 17–18. Conducting its own review of the summary judgment evidence, the Court notes that its prior inference was not unfounded, as Mr. Lager

---

[11] *Marrero v. City of Hialeah*, 625 F.2d 499, 515 (5th Cir. 1980) (defining goodwill as "the value inhering in the favorable consideration of customers arising from a business' reputation as being well established and well conducted"); *see also Beach Blitz Co. v. City of Miami Beach, Fla.*, No. 17-23958-CIV-UNGARO/O'SULLIVAN, 2017 WL 11589153, at *7 (S.D. Fla. Dec. 1, 2017) ("Under Florida law, [o]ne's business, aside from the investment of money and tangible property therein, is in every sense of the word property, and, as such, if lawful, entitled to protection from all unlawful interference.") (citation omitted).

[12] The Court noted "[i]n one post, he described himself as a 'successful 57-year-old . . . businessman,' 'always in the top 5% of sales,' and a 'Poster Boy for franchising.'" *See* ECF No. 25, p. 17.

admitted during his deposition testimony that he understood his attempts at disparagement would harm PIRTEK. ECF No. 38-3, p. 52, ll. 9–19.

Further, in support of its claim for breach of contract in the MSJ, the Plaintiff states that "PIRTEK entered the Second Settlement solely to prevent Lager from making his untrue and disparaging accusations that PIRTEK was a racist company public and to protect PIRTEK's reputation." ECF No. 38-1, p. 44. The Plaintiff cites to portions of the summary judgment record throughout its argument in support of this allegation, none clearer than when Mr. Lager agreed that his posts reflected poorly on PIRTEK. ECF No. 38-3, p. 52, ll. 17–20 and p. 59, ll. 8–11. There is simply no question in the Court's mind about the legitimacy of the Plaintiff's asserted business interest in this case. Therefore, based on the arguments advanced by Plaintiff and the summary judgment record in this case, the Court hereby finds that PIRTEK's interest in preserving customer goodwill qualifies as a legitimate business interest that reasonably justifies the enforceability of the non-disparagement and confidentiality clauses in the Second Settlement.

In light of the foregoing, and the summary judgment record as a whole, the Court finds that there is no issue of material fact as to whether the Defendants materially breached the Second Settlement's non-disparagement and confidentiality clauses, which were valid and enforceable restrictive covenants under Florida law.

3.   Damages

The final element of breach of contract which Plaintiff must prove is the damages resulting from the breach. *See Vega*, 564 F.3d at 1272. In its Motion, the Plaintiff argues it should be entitled to the amounts described in Section 12 of the Second Settlement (the "**Liquidated Damages Provision**"), totaling $453,000.00. ECF No. 38-1, p. 64; ECF No. 38-3, p. 148. Separately, Plaintiff argues that PIRTEK should be entitled to recover its attorney's fees and costs if the

Motion is granted because the Second Settlement contains a "prevailing party" provision. ECF No. 38-1, p. 64; ECF No. 38-3, p. 149. The Defendants do not contest the amount of PIRTEK's requested damages under the Liquidated Damages Provision. ECF No. 45, p. 24. However, Defendants object to the reasonableness of PIRTEK's requested attorney's fees, claiming that "the summary judgment record is devoid of evidence concerning the fees requested." *Id.* The Court will address the Plaintiff's request for damages and conclude its analysis on the breach of contract claim before moving to the Plaintiff's request for attorney's fees.

*i. Liquidated Damages*

It is well-settled in Florida that, "the parties to a contract may stipulate in advance to an amount to be paid or retained as liquidated damages in the event of a breach." *Lefemine v. Baron*, 573 So.2d 326, 328 (Fla. 1991) (citing to *Poinsettia Dairy Prods. v. Wessel Co.*, 166 So. 306 (1936)). The Florida Supreme Court has established a test to determine whether a provision for liquidated damages should be upheld rather than stricken as an unenforceable penalty clause. *Lefemine*, 573 So.2d at 328. First, the damages consequent upon a breach must not be readily ascertainable. *Id.* Second, the sum stipulated to be forfeited must not be "so grossly disproportionate to any damages that might reasonably be expected to follow from a breach as to show that the parties could have intended only to induce full performance, rather than to liquidate their damages." *Id.* "If it is unclear whether a provision for payment of an arbitrary sum is a penalty or genuine liquidated damages, then Florida courts tend to construe the provision as an unenforceable penalty." *Circuitronix, LLC v. Kinwong Electronic (Hong Kong) Co., Ltd.*, 993 F.3d

1299, 1306 (11th Cir. 2021) ((citing to *T.A.S. Heavy Equip. v. Delint, Inc.*, 532 So.2d 23, 25 (Fla. 4th DCA 1988)).[13]

In the instant case, the fact that Mr. Lager materially breached the Second Settlement's non-disparagement clause is not disputed. ECF No. 38-3, p. 52. This Court previously noted in its Order Denying Dismissal, "Plaintiff specifically negotiated for the right under the Second Settlement to be free from Mr. Lager's disparagement and the right to maintain the confidentiality of the terms of the Second Settlement. . . Absent enforcement, the Plaintiff does not receive the rights to which it is entitled as a non-breaching party under the Second Settlement." ECF No. 25, pp. 22–23. It is well-established that damages flowing from disparagement resulting in the loss of customer goodwill are difficult to compute.[14] Based on the foregoing, the Court finds that the first prong of the test is satisfied.

Courts interpreting the second prong have ruled that "the question of disproportionality operates as a proxy for the parties' intentions at the time of contracting," so courts look to what damages could have reasonably been expected at that time. *Circuitronix*, 993 F.3d at 1306 (citing *Hyman v. Cohen*, 73 So.2d 393, 401 (Fla. 1954)). In this case, the parties set out their agreement for liquidated damages in three separate subsections: Subsections 12(a), (b), and (c). ECF No. 38-3, p. 148. Based on the relief requested within the Motion, only Subsection 12(a) is at issue, which reads:

> 12. <u>Return of PIRTEK Payment and Payment of Portion of Waived Sums; Enforcement of Non-Compete</u>.
>    a. In the event any Lager Party materially breaches this Agreement, the Lager Parties agree to return the Payment (Section 1) and pay to PIRTEK the

---

[13] For instance, in *Circuitronix*, the Eleventh Circuit held that even though a defendant materially breached a settlement which caused a loss of goodwill to the plaintiff, the agreed $2 million figure for liquidated damages was an unenforceable penalty because the plaintiff was only doing about $3 million of total business each year. *See id.*

[14] *See, e.g., Ferrero v. Associated Materials, Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991) (holding that where a company loses its investment in good will and its long-time customers, the injury is "difficult, if not impossible, to determine monetarily"); *see also Spiegel v. City of Houston*, 636 F.2d 997 (5th Cir., Unit A, 1981) (holding that the loss of customers and goodwill is an "irreparable" injury).

Waived Sums (Section 2).[15] The Payment shall be returned and the Waived Sums shall be paid to PIRTEK via wire transfer within 10-days of determination by the arbitrator of any material breach.

*Id.* Notably, Subsections 12(b) and (c) would allow PIRTEK to recover "actual damages" and enforce the non-competition obligations the Defendants agreed to in their Franchise Agreements, but PIRTEK does not seek those remedies in the instant case. ECF No. 38-1, p. 64.

With the foregoing in mind, the Court finds that the liquidated damages sought by the Plaintiff in the instant case are easily determinable amounts within the realm of "what damages could have reasonably been expected" at the time of contracting (both categorically and in sum). Indeed, Plaintiff does not seek to recover some "arbitrary sum" as a penalty for Defendants' breach of the Second Settlement. Instead, the Plaintiff has requested reimbursement of the amounts it tendered as consideration for the rights it bargained for and was entitled to under the Second Settlement. As such, the Court finds that the liquidated damages sought by PIRTEK satisfy the second prong of the test for enforceability, and therefore PIRTEK is entitled to its requested $453,000.00 under Subsection 12(a) of the Second Settlement.

## ii. Attorneys' Fees and Costs

The Plaintiff also contends it is entitled to recover its fees and costs "[in] connection with the Arbitration that PIRTEK was required to initiate due to Lager's breach of the Second Settlement." ECF No. 38-1, pp. 64–65. The Defendants object to the award of attorneys' fees based on the Motion, arguing that the Second Settlement only allows a party to recover its "reasonable" attorneys' fees and costs, and the Plaintiff points to no evidence to support the reasonableness of

---

[15] Section 1 of the Second Settlement provided for a payment by PIRTEK to the Defendants of $300,000.00. Section 2 of the Second Settlement provided that PIRTEK would waive the Defendants' obligation to pay PIRTEK the $153,000.00 that PIRTEK claimed the Defendants owed it under the First Settlement, and that PIRTEK would "[agree] that the Lager Parties owe no other amounts under the [First Settlement] or other agreement or arrangement." ECF No. 38-3, p. 139.

their requested fees and costs. ECF No. 45, p. 24. Plaintiff fires back that Defendants' argument is made without any citation to legal authority and that the Court, as the trier of fact, may award attorneys' fees as a matter of law. ECF No. 52, p. 30 (citing to *Easterling v. U.S. Bank Nat'l Ass'n*, No. 16-3403, 2018 WL 7266516, at *22-23 (N.D. Tex. Dec. 6, 2018), *report and recommendation adopted*, No. 16-3403, 2019 WL 156264 (N.D. Tex. Jan. 10, 2019)).

The Second Settlement provides that "[t]he prevailing party in any legal proceeding to enforce the terms of this Agreement is entitled to recover its reasonable attorneys' fees and costs from the non-prevailing party." ECF No. 38-3, p. 149. Under Florida law, a "prevailing party" is the party who "succeed[ed] on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Moritz v. Hoyt Enterprises, Inc.*, 604 So.2d 807, 810 (Fla. 1992) (citing to *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)). In *Florida Patient's Compensation Fund*, the Florida Supreme Court laid down specific guidelines for computing a reasonable attorneys' fee, adopting the federal lodestar approach as an objective structure. 472 So.2d 1145, 1150–51 (Fla. 1985).

The first step in the lodestar process requires the Court to determine the number of hours reasonably expended on the litigation. *Id.* at 1150. The *Florida Patient's* court stated that to accurately assess the labor involved, the attorneys' fee applicant should present records detailing the amount of work performed, noting that "inadequate documentation may result in a reduction in the number of hours claimed[.]" 472 So.2d at 1150. The absence of time records is not fatal to an effort to recover fees, but courts in Florida require "substantial, competent evidence" to support the reasonableness of the claimed fees. *See Grapski v. City of Alachua*, 134 So.3d 987, 989 (Fla. 1st DCA 2012) (citing to *Jones & Granger v. Johnson*, 788 So.2d 381, 385 (Fla. 1st DCA 2001)). Courts have consistently found that "substantial, competent evidence" of reasonableness includes

expert witness testimony or affidavits, so long as they detail the hours an attorney reasonably should have incurred based on a thorough review of the record. *See id.*; *see also Smith v. Sch. Bd. of Palm Beach Cnty.*, 981 So.2d 6, 9 (Fla. 4th DCA 2007) ("Evidence of rates may be adduced through direct evidence of charges by lawyers under similar circumstances or by opinion evidence.").

In the instant case, the Plaintiff argues first that the attorneys' fees are "identified" in the Declaration of Ms. Kim Gubera but cites to no other evidence or testimony supporting the reasonableness of the fees requested. ECF No. 38-1, p. 65; ECF No. 52, p. 30. Further, the Plaintiff requests that the Court award its requested fees as a matter of law because the Defendants failed to "challeng[e] the amount of PIRTEK's fees" or "take any discovery regarding such fees." ECF No. 52, p. 30. However, the case Plaintiff cites to for this proposition is inapposite, as the *Easterling* court noted that the movant "support[ed] the requested fees with an affidavit from its counsel stating the total amount of time rendered in connection with seeking a foreclosure of the Property, and the total amount due…" 2018 WL 7266516, at *22. The court noted that the affidavit included the amount billed per hour, and that based on the affiant's experience as an attorney, the rate was reasonable and consistent with rates charged by comparable firms in Texas. *Id.*

The Gubera Declaration lacks the elements necessary to prove reasonableness. The Court hereby finds that the Plaintiff has failed to meet its burden to show the absence of a material issue of fact as to reasonableness of its requested fees. ECF No. 45, p. 24. Plaintiff wholly failed to produce any evidence in the instant case to support a finding of reasonableness, therefore the Court will deny Plaintiff's request for an award of attorneys' fees "as a matter of law," without prejudice to reurging.

### B. Nondischargeability under 11 U.S.C. § 523(a)(6)

Count III of PIRTEK's Amended Complaint seeks to have the entirety of its proof of claim declared non-dischargeable under 11 U.S.C. § 523(a)(6). ECF No. 14, pp. 37–38. By the MSJ, the Plaintiff requests summary judgment on the non-dischargeability of its claim as a debt resulting from the Defendants' knowing breach of a clear contractual obligation that was certain to cause injury. ECF No. 38-1, pp. 45–51. The Defendants argue primarily that the injury at issue, based in breach of contract, does not rise to the level necessary to warrant non-dischargeability under section 523(a)(6) and that PIRTEK has failed to specify the **precise** harm it suffered other than breach of contract.[16] ECF No. 45, pp. 19–20. The Court will first address the Defendants' arguments before turning to whether the Plaintiff has met its burden of proof under Rule 56(c).

This Court has previously recognized that the exception to discharge under § 523(a)(6), when successfully litigated, is "almost universally in the context of a tort claim." *Reticulum Mgmt., LLC v. Watters (In re Watters)*, Adv. No. 20-3088, 2021 Bankr. LEXIS 2309, at *52 (Bankr. N.D. Tex. Aug. 24, 2021); *see also, e.g., Zaretsky v. Zaretsky (In re Zaretsky)*, Case No. 8-16-71614, 2014 WL 2085614, at *3–4 (Bankr. E.D.N.Y. May 3, 2018) (finding that the debtor's defamatory statements caused a willful and malicious injury to the plaintiff which was nondischargeable pursuant to § 523(a)(6)). Nevertheless, the Fifth Circuit has held that "a **knowing** breach of a clear contractual obligation that is **certain to cause injury** may prevent discharge under Section 523(a)(6), **regardless of the existence of separate tortious conduct**." *Williams v. IBEW Local 520 (In re Williams)*, 337 F.3d 504, 509 (5th Cir. 2003) (emphasis added).

---

[16] The Court will note that Defendants also oppose the entry of summary judgment on Plaintiff's Count III if such relief should be afforded on the basis that Mr. Lager violated the Arbitrator's TRO. *See* ECF No. 45, p. 20. This stems from Plaintiff's argument that Mr. Lager's knowing and intentional violation of the aforementioned TRO supports a finding of willful and malicious intent to injure in the same vein as a debtor's "intentional defiance of a court order enjoining certain acts," as such has been found to satisfy the requirements of section 523(a)(6). ECF No. 38-3, pp. 49–51. The Court declines to reach the issue of whether a violation of the Arbitrator's TRO should be treated similarly to the intentional defiance of a court order for the purposes of non-dischargeability.

Courts have consistently held that section 523(a)(6) is applicable where a debtor acted with the intent to cause injury or where the debtor's actions had an objective substantial certainty to cause the plaintiff harm. *See, e.g., In re Perry*, 423 B.R. 215, 264–66 (Bankr. S.D. Tex. 2010) (finding the damages resulting from breach of a purchase agreement were non-dischargeable under section 523(a)(6) where the debtor sent an e-mail indicating a plan to cause monetary injury to the plaintiffs); *see also, e.g., In re Nazarko*, No. 05-4270, 2008 WL 304785, at *6–7 (Bankr. E.D. Tex. Jan. 31, 2008) (holding a debt non-dischargeable where the debtor knew or should have known that his breach of contract would injure the plaintiff).

Defendants argue that PIRTEK "failed to specify the precise harm it suffered other than [Mr.] Lager's alleged breaches of the Settlement." ECF No. 45, p. 20. The focus of the Court is "not the specific injury which occurred," but rather "the intent to cause an injury or to intentionally act in a manner which the ***debtor knows*** should cause injury." *In re Whiters*, 337 B.R. 326, 349 (Bankr. N.D. Ind. 2006) (emphasis in original). As the Fifth Circuit stated in *Vollbracht*, "[t]he test for willful and malicious injury under § 523(a)(6) … is condensed into a single inquiry of whether there exists 'either an objective substantial certainty of harm or a subjective motive to cause harm' on the part of the debtor." *Berry v. Vollbracht (In re Vollbracht)*, 276 F. App'x 360, 361 (5th Cir. 2007) (quoting *Williams*, 337 F.3d at 509 (5th Cir. 2003)); *In re Watters*, 2021 Bankr. LEXIS 2309, at *52 (quoting *Fairlane Fixed Income Fund, LLC v. Feigl (In re Feigl)*, Adv. No. 20-3011, 2020 Bankr. LEXIS 2506, at *21–22 (Bankr. N.D. Tex. Sept. 25, 2020)). As such, the Court rejects the Defendants' argument that Plaintiff has failed to fulfill its burden by failing to specify the "precise harm" it suffered; and, accordingly, the Court will next consider the knowledge and intent of the Defendants at the time of the breaches.

Mr. Lager is not a layman in his industry. ECF No. 25, p. 17. In one of his posts, he described himself as a "successful 57-year-old businessman," "involved in franchising for a period that spans four decades," "in the top 5%," and a "Poster Boy for franchising." ECF No. 38-4, p. 34. Mr. Lager's deposition testimony backs up these claims, showing that prior to his franchise career with PIRTEK, he was a dealer with Snap-On Tools, and grew his business to five franchises over approximately nine years, having been a salesman for the same franchise some years before that. ECF No. 38-2, pp. 98-101. Therefore, there can be no doubt that Mr. Lager knew or should have known that accusing a business of racially discriminatory practices would materially harm its reputation.

There is also no doubt in the Court's mind that Mr. Lager acted with the requisite *mens rea*. The facts of this case and the extreme nature of Mr. Lager's statements clearly demonstrate that Mr. Lager intended to harm PIRTEK's reputation by breaching the Second Settlement. The summary judgment record is replete with evidence of numerous instances of Mr. Lager directly posting to his own personal social media account disparaging content and defamatory comments about PIRTEK, its executives, and their purportedly racist and abusive business practices. Moreover, Mr. Lager testified at his sworn deposition that he understood his breaches of the Second Settlement hurt PIRTEK. Specifically, he testified, "Sitting here with you now, I understand that hurts them." ECF No. 38-3, p. 52, ll. 17–20. As such, the Court concludes that the Plaintiff is entitled to summary judgment as to the non-dischargeability of the debts arising out of the Defendants' material breach of the Second Settlement based on Mr. Lager's direct actions and statements, made in knowing, intentional violation of the Second Settlement, with substantial certainty of causing injury to PIRTEK.

### C. Injunctive Relief

Section 542.335(1)(j) of the Florida Statutes states that "[a] court shall enforce a restrictive covenant by any appropriate and effective remedy, including ***but not limited to***, temporary and permanent injunctions." FLA. STAT. § 542(1)(j) (emphasis added). Counts I and II of the Plaintiff's Amended Complaint request preliminary and permanent injunctive relief enforcing the non-disparagement and confidentiality provisions of the Second Settlement. ECF No. 14, pp. 33–37. The Defendants allege that PIRTEK cannot satisfy the elements for injunctive relief. ECF No. 28, p. 18, ¶ 128. Specifically, the Defendants argue that PIRTEK cannot be granted injunctive relief because (1) Plaintiff improperly relies on a ***presumption*** of irreparable injury under Florida law that improperly conflicts with the burden imposed by Rule 65, and (2) PIRTEK has failed to seek a preliminary injunction from the Court, which undermines its claim that it has been irreparably injured. ECF No. 45, p. 21. Plaintiff clarifies that Florida law controls when a party seeks a permanent injunction, and further argues that its delay in seeking preliminary injunction is attributable to its belief that Defendants would obey this Court's prior oral admonishment to Parties to discontinue any further disparaging remarks about one another outside of court; therefore its failure to pursue a temporary injunction does not negate the Court's finding of irreparable harm. ECF No. 52, p. 23. Plaintiff fears that, without a permanent injunction, as soon as the instant case is resolved, Defendants will resume their attempts to disparage PIRTEK in the public eye, therein causing further irreparable injury. ECF No. 52, p. 26.

First and foremost, the Court must determine whether federal or state law provides the standard by which the Court may issue a permanent injunction. The Defendants argue that federal law controls, whereas Plaintiff argues that the Court should look to Florida state law. *Compare* ECF No. 45, pp. 20–21 *with* ECF No. 52, pp. 20–22. Although the Court will note that federal

courts interpreting Florida law have been unclear on the issue, it appears that Plaintiff's argument is best supported by recent precedent discussing the issue – "whether to grant a permanent injunction is governed by state law." *RJ's Int'l Trading, L.L.C. v. Crown Castle South, L.L.C.*, No. 20-25162-CIV-ALTONAGA/Torres, 2023 WL 2002372, at *3 (S.D. Fla. Jan. 13, 2023) (citing to *Am. Debt Counseling, Inc. v. Exclaim Mktg., L.L.C.*, No. 12-62205-Civ, 2013 WL 12092097, at *4 (S.D. Fla. May 16, 2013)).

The Defendants' insistence that federal law applies is not without support. In so arguing, Defendants rely on *Blue-Grace Logistics L.L.C. v. Fahey*, a federal district court case that applied federal law instead of Florida law on a request for a ***preliminary,*** not ***permanent*** injunction. ECF No. 45, p. 21 (citing 340 F.R.D. 460, 465 (M.D. Fla. 2022)). A recent decision out of the Southern District of Florida has helped to clarify that while preliminary injunctions are subject to federal law under Rule 65, whether a plaintiff is entitled to permanent injunction should be governed by state law. *See RJ's Int'l Trading, L.L.C.*, 2023 WL 2002372, at *3 (citing to *Vital Pharms., Inc. v. Alfieri*, 23 F.4th 1282, 1297–98 (11th Cir. 2022) (Pryor, C.J., concurring) (differentiating the law governing preliminary and permanent injunctions in federal cases)). As such, the Court will apply Florida state law in evaluating whether to grant Plaintiff's request for injunctive relief.

To obtain a permanent injunction in Florida, the Plaintiff must satisfy a four-part test: (1) success on the merits of the case; (2) lack of adequate remedy at law; (3) irreparable harm absent the entry of an injunction; and (4) that injunctive relief will serve the public interest. *See Liberty Counsel v. Florida Bar Bd. of Governors*, 12 So.3d 183, 186, n. 7 (Fla. 2009). The Court "has broad discretion to grant an injunction[.]" *RJ's Int'l Trading, L.L.C.*, 2023 WL 2002372, at *4. While the Court may combine "equitable and legal remedies[,]" Plaintiff is not allowed to obtain "double recovery for the same injury." *F.T.C. v. Leshin*, 719 F.3d 1227, 1232 (11th Cir. 2013)

(quoting *MCA Television Ltd. v. Pub. Int. Corp.*, 171 F.3d 1265, 1274 (11fth Cir. 1999)) (alteration added; quotation marks omitted).

In the instant case, the Plaintiff has succeeded on the merits of its breach of contract claims. Defendants clearly breached the confidentiality and non-disparagement provisions of the Second Settlement, which were enforceable restrictive covenants under Florida law. As the Fifth Circuit noted in *Marrero v. City of Hialeah*, property rights are clearly at stake in this case, in that Florida law extends a "legal guarantee of present enjoyment of goodwill" to businesses.[17]

Because Plaintiff's property rights are at stake, the Court will next determine whether "irreparable harm has been threatened, and [whether] there is a lack of an adequate remedy at law." *Shaw v. Tampa Elec. Co.*, 949 So.2d 1066, 1069 (Fla. 2d DCA 2007) (citations omitted). "[I]rreparable harm is not established where the potential loss can be adequately compensated for by a monetary award." *B.G.H. Ins. Syndicate, Inc. v. Presidential Fire & Cas. Co.*, 549 So.2d 197, 198 (Fla. 3d DCA 1989) (citations omitted). The court may combine "equitable and legal remedies … such as an injunction that prevents future harm along with … damages that compensate[] for past harm." *Leshin*, 719 F.3d at 1232 (citation omitted); *see also Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1232 (11th Cir. 2009) (stating that a combination of injunctive relief and damages, where injunction prevents future harm and damages compensate for the past, is the most common combination of remedies).

Under Florida law, "[t]he violation of an enforceable restrictive covenant creates a presumption of irreparable injury to the person seeking enforcement of a restrictive covenant." FLA. STAT. § 542.335(1)(j). This is because money damages are often considered inadequate to remedy violations of restrictive covenants, partly because of the inherently difficult task of

---

[17] 625 F.2d at 515.

calculating such damages. *See Caparo v. Lanier Bus. Products, Inc.*, 466 So.2d 212, 213 (Fla. 1985); *see also AmeriGas Propane, Inc. v. Sanchez*, 335 So.3d 1253, 1258 (Fla. Dist. Ct. App. 2021). The Eleventh Circuit has stated that "preventing irreparable harm in the future is 'the *sine qua non* of injunctive relief.'" *Alabama v. U.S. Army Corps of Engineers*, 424 F.3d 1117, 1133 (11th Cir. 2005) (quoting *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Amer. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990)). In the instant case, the Plaintiff has already proven that the Defendants violated enforceable restrictive covenants within the Second Settlement, creating a ***presumption*** of irreparable injury under Florida law. Once there is a demonstration that a valid restrictive covenant was violated, the burden shifts to the Defendants to rebut the presumption of irreparable harm. *See Pitney Bowes Inv. v. Acevedo*, 2008 WL 2940667, at *5 (S.D. Fla. July 28, 2008).

"In determining whether harm is irreparable, courts consider the nature of the harm alleged and the delay of the movant in seeking relief." *United States v. Williams*, 476 F.Supp.2d 1368, 1377 (M.D. Fla. 2007). The Defendants argue that Plaintiff's delay in taking action to prevent further harm by failing to seek a preliminary injunction undermines their claim of irreparable injury. ECF No. 45, p. 21. In support of this proposition, Defendants cite to *Hurry Fam. Revocable Trust v. Frankel*, where the court considered whether to grant a permanent injunction in a case where the plaintiffs had knowledge that the defendant was using their confidential client list to solicit their best customers yet did not seek, throughout the entire years-long process of litigation, to prevent the defendant from using their confidential information in order to unfairly compete. No. 8:18-cv-2869-CEH-CPT, 2023 WL 23805, at *17–18 (M.D. Fla. Jan. 3, 2023). However, the *Hurry Fam.* case is distinguishable from the instant case. To gauge the Plaintiff's actions, one must consider the factual history of these proceedings.

The Plaintiff in this case may not have sought preliminary injunctive relief, but it did seek to seal the contents of these proceedings, referring to their request for a preliminary injunction in the Original Complaint. *See* ECF No. 3. Furthermore, the Plaintiff notes in its Reply that the reason why it did not seek further preliminary relief was largely based on this Court's ruling on the Motion to Seal, wherein the Court admonished the Parties that it would have little patience for "gamesmanship and further public statements[.]" ECF No. 52, pp. 23–25 (quoting ECF No. 17, p. 8, ll. 2–16). As PIRTEK points out, following this admonition, Mr. Lager stopped publishing disparaging content about PIRTEK for many months. *Id.* In fact, in Mr. Lager's deposition testimony, he stated that "I was scolded by [this Court] to stop and whatever day she scolded me, we stopped." ECF No. 52-1, p. 8, ll. 20–23.

As such, at least for the period of time between this Court's ruling on the Motion to Seal, on May 24, 2022, and the filing of the MSJ on January 20, 2023, wherein PIRTEK sought a permanent injunction, the Defendants refrained from actively disparaging PIRTEK in public view. This situation is notably different from the one in *Hurry Fam.*, where the plaintiffs were aware of the defendant's access to confidential information and his active use of the same to unfairly compete, and still took no action seeking preliminary injunctive relief for years. In light of the foregoing, it is reasonable for PIRTEK to have delayed in seeking preliminary injunctive relief, and the Court thus finds that PIRTEK's failure to seek a preliminary injunction does not significantly undermine the presumption of irreparable injury in this case.

The next question is whether there is an adequate remedy at law available to cure the injury, the lack of which would enable Plaintiff to obtain injunctive or other equitable relief. *See Shaw*, 949 So.2d at 1069.  Florida courts favor injunction as a remedy for injuries where damages are difficult to ascertain, especially where one party in unable to enforce or receive the benefit of an

agreement going forward. *See Lae Beauty, Inc. v. Giansanti*, No. 01-2017-CA-001168, 2018 Fla.
Cir. LEXIS 786, at *19 (Fla. Cit. Ct. Apr. 16, 2018) ("[T]he *usual* remedy in cases involving a
valid [restrictive covenant] is injunctive relief because 'it is extremely difficult for a court to
determine what damages are caused by breach of the covenant.'") (quoting *Envtl. Servs., Inc. v.
Carter*, 9 So.3d 1258, 1261 (Fla. 5th DCA 2009)) (emphasis in original, alteration added).

In the instant case, the Court concludes that there is no adequate remedy at law that could
cure the future harms that are inevitable without the Court's imposition of a permanent injunction
barring the Defendants from further disparagement of the Plaintiff in this case. For instance, in
*NITV Federal Services, LLC v. Dektor Corporation*, the District Court for the Southern District of
Florida granted a permanent injunction, finding no adequate remedy at law existed where the court
found it likely that "Defendants will continue their campaign of disparaging e-mails, letters, and
websites dedicated to damaging Plaintiff's business." No. 18-80994-Civ-Brannon, 2019 WL
7899731, at *8 (S.D. Fla. Dec. 16, 2019). The Court finds the instant case to be eminently similar
to the situation warranting permanent injunction in *NITV Federal Serv's, LLC.*

The Court notes that the summary judgment record reflects multiple instances where the
Defendants have evinced a desire to publish books, a website, and other significant media
undertakings singularly dedicated to damaging the Plaintiff. *See, e.g.,* ECF No. 38-2, pp. 23–26;
*see also, e.g.,* ECF No, 38-3, p. 154; ECF No. 38-4, p. 20. More specifically, the Defendants have
shown that they were committed to publishing media content designed to harm the Plaintiffs ***even
after*** contracting away their very right to do so and receiving significant compensation therefor.[18]

---

[18] The Second Settlement was signed on September 2, 2020. ECF No. 38-3, p. 152. Only four weeks later, Mr. Lager
sent an e-mail to Mr. Kelly proposing a format for a book to be published, including an outline discussing Mr. Lager's
personal history as "[a] white business man that fell victim to racism because of who he dated," refraining from naming
PIRTEK specifically, yet referring to franchisees as "slaves" and franchisors as "dictators." ECF No. 38-3, p. 154.
The e-mail also attached a copy of the Second Settlement in overt violation of the terms thereof, which Mr. Lager had
agreed to keep confidential. ECF No. 38-4, pp. 1–18. About six months later, Mr. Lager sent another e-mail to Mr.
Kelly, saying that he wanted Mr. Kelly's help on "this lawsuit" and proposing to commit to him a portion of any

Moreover, the Defendants have shown that they cannot be contained by less restrictive measures, as they have invoked third parties to help them in their mission to disparage PIRTEK. *See, e.g.,* ECF No. 38-4, p. 20; ECF No. 38-5, pp. 57–77; ECF No. 38-6, pp. 2–4. As such, there is no doubt in the Court's mind that absent entry of a permanent injunction, the Defendants will resume their campaign of publishing disparaging material dedicated to damaging the Plaintiff's business.

The Court also finds it discouraging that even after this Court issued a warning to both Parties to stay in their respective corners and cease any further statements about the other within the public realm, Mr. Kelly, who receives thousands of dollars in compensation from Defendants every month for "marketing services" feels free to publish disparaging content about PIRTEK on his website, unhappyfranchisee.com. *See, e.g.,* ECF No. 59, pp. 9–39. Indeed, Mr. Kelly was even so bold as to address one such post directly to the presiding judge of this Adversary Proceeding. *Id.* at p. 13. In that post, Mr. Kelly states that PIRTEK has attempted to characterize him as "an attack dog and/or puppet rather than [an] independent, self-determined journalist." *Id.*

However, holding the Defendants accountable for posts on Mr. Kelly's website is thoroughly substantiated. The Second Settlement contained specific language barring the Defendants from promoting any posts about PIRTEK on unhappyfranchisee.com in its non-disparagement provision. *See* ECF No. 38-3, p. 142. In direct violation of that agreement, Mr. Lager sent information to Mr. Kelly to be disseminated on unhappyfranchisee.com that would directly disparage PIRTEK. *See, e.g.,* ECF No. 38-5, pp. 57–77. Further, the Court finds it

---

monetary recovery he received, because "I want both You and I to move into a financial position that will allow us to write our book." ECF No. 38-4, p. 20. On January 7, 2022, shortly before filing for bankruptcy protection, and while the Defendants were involved in the Arbitration, Mr. Lager sent Mr. Kelly an e-mail suggesting that Mr. Kelly post a presentation to his website containing a narrative designed to drag PIRTEK through the mud publicly. ECF No. 38-5, pp. 57–77. On the same day, an e-mail from Mr. Lager to Mr. Marks shows that Mr. Lager apparently sent a page from unhappyfranchisee.com (Mr. Kelly's website) to all PIRTEK franchisees. ECF No. 38-6, pp. 2–4. The unhappyfranchisee.com page that he sent refers to PIRTEK as "racist," "heavy handed," and engaged in "bullying" of franchisees. *Id.*

significant that Mr. Kelly's company, IdeaFarm, is specifically retained by JBL for "marketing services" and is paid $5,000.00 per month, while Mr. Kelly simultaneously runs a website named unhappyfranchisee.com with PIRTEK as a highlighted franchisor. *See* ECF No. 61, p. 10. Finally, the Court notes that Mr. Lager has specifically pledged a portion of any monetary recovery from legal action against PIRTEK to Mr. Kelly, thereby creating a separate reason for Mr. Kelly to post disparaging content about PIRTEK without Mr. Lager's specific direction. *See* ECF No. 38-4, p. 20. To borrow a line from the prolific urban poet, Lil Wayne: "don't go around fire expectin' not to sweat" – a cautionary tale which mirrors the Latin *inevitabilis exitus*, meaning an inevitable outcome. EMINEM FEAT. LIL WAYNE, *No Love, on* RECOVERY (Aftermath Entm't 2010). As it relates to PIRTEK, it is quite difficult to parse between the musings of Mr. Kelly on unhappyfranchisee.com from those of the Defendants at this juncture. They are lockstep in their dogged pursuit to drag PIRTEK through the mud. Given their formal and informal affiliations, the Court finds it dubious that Mr. Kelly's "independent" postings lack the approbation of the Defendants.

It is a long-accepted legal maxim that the public interest is served by enforcing valid contracts, and thus the public-interest factor also favors the enforcement of valid restrictive covenants. *See Larweth v. Magellan Health, Inc.*, 841 Fed. App'x 146, 159 (11fth Cir. 2021) (citing to *N.I.S. Corp. v. Swindle*, 724 F.2d 707, 710 (8th Cir. 1984)). This Court's permanent injunction would enforce PIRTEK's valid and reasonable restrictive covenants going forward, which it bargained for fairly and has been denied receiving the benefit of by Defendants, thereby satisfying the fourth requirement for permanent injunction.

For the foregoing reasons, the Court finds that the Plaintiff has satisfied the requirements for a permanent injunction and should therefore be entitled to an injunction commensurate with the Second Settlement. The injunction issued by this Court shall include the following:

> Lager, individually and through any company controlled by him, in whole or in part, will not engage in any communication or statement (whether verbal, written, online (including on unhappyfranchisee.com) or through any social media platform) designed to disparage PIRTEK or any PIRTEK Party. Lager further will not act in concert with, direct, or suggest to any third-party, including his employees and attorneys, to engage in any communication or statement, regarding any PIRTEK Party, including but not limited to any PIRTEK employee, franchisee, customer, and supplier, that could reasonably be considered disparagement. This prohibition shall include, but not be limited to, a prohibition on Lager and any such third-party acting on his behalf or at his direction or suggestion, from tagging, liking, forwarding, commenting on, retweeting or taking similar actions as to internet and social media posts that disparagingly refer to, relate, or mention (implicitly or explicitly) PIRTEK or any PIRTEK Party. Lager must instruct his employees and any party acting on his behalf, at his direction or suggestion, or in concert with him that they are prohibited from disparaging PIRTEK and all PIRTEK Parties.[19]

Therefore, going forward, the Defendants should be ***extremely careful*** not to take any action where it could be reasonably alleged that a third party, such as Mr. Kelly, disparages PIRTEK or any PIRTEK Party (as defined within the Second Settlement) if it could reasonably be alleged that such action was at the Defendants' suggestion or in concert with the same. ***This would include any further violation of the valid and enforceable confidentiality provision of the Second Settlement.*** Any violation of this Court's injunction will be considered grounds for appropriate sanctions under applicable law and the terms of the Second Settlement.

### D. Defendant's Remaining Counterclaims

Next, the Court will evaluate the Defendants' remaining counterclaims, each of which were alleged under Texas law, except for the claim brought under the Florida Deceptive and Unfair

---

[19] Any capitalized term not otherwise defined within the Court's injunction shall have the meanings ascribed to them within the Second Settlement contained at ECF No. 38-3, pp. 137–52.

Trade Practices Act ("**FDUTPA**"). First, Plaintiffs argue that the Court should grant summary judgment as a matter of law on Defendants' Second, Third, and Fourth Counterclaims because the Defendants failed to offer any evidence or arguments of law in support of same. ECF No. 52, pp. 9–10. These counterclaims include the Defendants' counterclaim for violation of the FDUTPA, the counterclaim for tortious interference, and the counterclaim for Defamation/Slander. *See, e.g.,* ECF No. 28, pp. 23–25. The Court will first analyze whether the Plaintiff fulfilled its burden under Rule 56(c) with regard to these counterclaims before analyzing the Defendants' remaining counterclaims regarding the alleged violation of the automatic stay and right of setoff.

> 1. Counterclaim Count II - Violation of the Florida Deceptive and Unfair Trade Practices Act

PIRTEK argues that it is entitled to summary judgment on Defendants' FDUTPA counterclaim because (1) FDUTPA does not protect the Defendants, residents of Texas, where the alleged deceptive conduct occurred in Texas; (2) a breach of contract does not constitute a violation of FDUTPA; (3) PIRTEK did not engage in any conduct that constitutes a violation of FDUTPA; and (4) the FDUTPA claim is barred by the release in the Second Settlement. Considering the Defendants failed to offer any response to Plaintiff's request for summary judgment on the FDUTPA counterclaim, the Court will briefly analyze whether Plaintiff's MSJ establishes that the Defendants' FDUTPA counterclaim should fail as a matter of law.

The FDUTPA prohibits "unfair methods of competition, unconscionable acts or practices and unfair or deceptive acts or practices in the conduct of any trade or commerce." FLA. STAT. § 501.204(1). The FDUTPA defines "trade or commerce" as the "advertising, soliciting, providing, offering, or distributing, whether by sale, rental or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated." FLA. STAT. § 501.203(8). The Florida Supreme Court has previously held that

an "unfair act" is one that "offends established public policy and one that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to customers." *PNR, Inc. v. Beacon Property Mgmt., Inc.*, 842 So.2d 773, 777 (Fla. 2003).

In their Answer, the Defendants alleged that Plaintiff continued to use Mr. Lager's name, image, and likeness in commerce without authority or consent after the Second Settlement. ECF No. 28, p. 23, ¶ 26. However, in her sworn Declaration in support of the MSJ, Ms. Kim Gubera states unequivocally as PIRTEK's CEO that "at no time after the September 2, 2020, settlement has PIRTEK included Lager's image, or any reference to Lager in any of PIRTEK promotional materials, webpage, website, print media, or social media created after the Second Settlement was entered." ECF No. 38-2, p. 13, ¶ 28. However, Ms. Gubera acknowledged that at one point after the Second Settlement, it was brought to PIRTEK's attention that an article from nearly ten years prior still existed in a ten-year-old PIRTEK newsletter available only to those with access to PIRTEK's secure intranet. *Id.* at ¶ 29. The article described Mr. Lager receiving awards. *Id.* The Defendants' Response does not engage with any of PIRTEK's FDUTPA arguments in the MSJ or the evidence adduced in support of summary judgment.

Even taking into account the possibility that PIRTEK may have allowed some historical references to Mr. Lager to remain on its internal webpage, the Court concludes that such actions would not rise to the level of an intentional act undertaken in furtherance of "trade and commerce" in an unfair manner. Rather, assuming *arguendo* that these antiquated references to Mr. Lager on PIRTEK's sites violated the Second Settlement, such instances would only constitute a potential breach of contract, which would not support an FDUTPA claim. *See* ECF No. 38-1, p. 69.

Separately, Defendants allege that Plaintiff violated FDUTPA because it had access to Google Business and exercised control of the link of Mr. Lager's former franchise listing in order

to alter JBL's location in Google Maps to direct the public to the location of the new PIRTEK franchise. *Id.* Mr. Lager admitted in his deposition testimony that he had no evidence proving and did not himself know whether PIRTEK manipulated the Google Maps algorithm or was otherwise involved with the issue he described as an intentional FDUTPA violation. ECF No. 38-2, p. 114, ll. 18-22. In contrast, in her sworn Declaration in support of the MSJ, Ms. Kim Gubera states unequivocally as PIRTEK's CEO that "PIRTEK has not altered JBL Hose's Google Maps or Google Business page in any way since the Second Settlement was entered." ECF No. 38-2, p. 14, ¶ 30. In light of the foregoing testimony, and especially considering that the Defendants failed altogether to respond to Plaintiff's arguments in support of summary judgment on the FDUTPA claim,[20] the Court hereby grants summary judgment on the Defendants' FDUTPA counterclaim.

### 2.   Counterclaim Count III - Tortious Interference with Prospective Business Relations

The Defendants' third counterclaim alleges tortious interference with prospective business relations under Texas law. ECF No. 28, pp. 23–24. Similar to the FDUTPA counterclaim, Defendants allege that PIRTEK "tortiously interfered" with the Defendants' business relations by manipulating Google Maps so that PIRTEK's nearby location appeared under JBL Hose's name, thereby confusing JBL's customers. *Id.* After a brief review of the applicable law and the evidence adduced by Plaintiff in support of its MSJ, the Court will grant summary judgment on the Defendants' counterclaim for tortious interference.

The Texas Supreme Court has held that, to prevail on a claim for tortious interference with prospective business relations, "the plaintiff must establish that (1) there was a reasonable probability that the plaintiff would have entered into a business relationship with a third party; (2)

---

[20] *See United States Dist. Ct. S. Dist. of Texas Houson Div. Kenneth Earl Davis v. Kroger Co.*, No. 13-2892, 2016 WL 193785, at \*4 (S.D. Tex. Jan. 15, 2016) (holding that summary judgment was proper because plaintiff failed to respond to defendant's motion for summary judgment on plaintiff's claim, which was supported by testimony and legal argument).

the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the plaintiff's injury; and (5) the plaintiff suffered actual damage or loss as a result." *Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013).

As mentioned above, the Plaintiffs rely on Ms. Gubera's Declaration, which states unequivocally that "PIRTEK has not altered JBL Hose's Google Maps or Google Business page in any way since the Second Settlement was entered." ECF No. 38-2, p. 14, ¶ 30. Further, Plaintiffs argue that given the fact that PIRTEK did not take any action in this manner, Defendants could not possibly establish the elements of their cause of action. ECF No. 38-1, p. 76 (citing to *Martinez v. DISA, Inc.*, 435 F.Supp.3d 747, 754 (W.D. Tex. 2020) (granting defendant's summary judgment motion on tortious interference claim where plaintiff could not show the defendant engaged in any tortious or unlawful conduct identified in complaint). Defendants declined to address the Plaintiff's arguments or evidence in their Response. As such, the Court hereby grants Plaintiff's motion for summary judgment with respect to the Defendants' counterclaim therefor.

### 3. Counterclaim Count IV - Defamation/Slander

The Defendants allege in their Answer that Plaintiff's agent and representative, the operations manager for the PIRTEK Plano, Texas, franchise, made statements that Mr. Lager "shouldn't be operating because of the lawsuit," that Mr. Lager was "out of his mind" and that he felt bad for Mr. Lager's "employees he can't pay" and further statements along those lines. ECF No. 28, p. 22, ¶ 17. In its MSJ, the Plaintiff points out that franchisees are typically considered independent contractors under the law, PIRTEK's franchisees are contractually required to hold themselves out as independent contractors, and further that PIRTEK has no contractual right to

control what a franchisee's employee says. ECF No. 38-1, pp. 77–80. Therefore, Plaintiff argues, Defendants' theory that PIRTEK Plano's operations manager was acting as PIRTEK's agent when making disparaging comments fails as a matter of law.

Generally, a person has no duty to control the conduct of another. *See Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307, 309 (Tex. 1983). Under the theory of respondeat superior, however, an employer may be liable vicariously for the negligent acts of its employee if the employee's actions are within the course and scope of his employment. *See Painter v. Amerimex Drilling I, Ltd.*, 561 S.W.3d 125, 131 (Tex. 2018). A franchisor may be held vicariously liable under an agency theory for the tortious acts of a franchisee, or a franchisee's employee, when the franchisor has direct control of, or the right to control, the day-to-day operations of the franchisee. *See Doe v. YUM! Brands, Inc.*, 639 S.W.3d 214, 232 (Tex. App. 2021). "A contract expressly providing that a person is an independent contractor is determinative of the relationship absent evidence that the contract is a mere sham or subterfuge designed to conceal the true legal status of the parties or that the contract has been modified by a subsequent agreement between the parties." *Id.* at 233.

In the instant case, the Plaintiff has produced evidence showing that the PIRTEK Plano franchise employee could not have been considered an agent for the purposes of vicarious liability. ECF No. 38-1, p. 79; ECF No. 38-2, p. 14, ¶ 32; ECF No. 38-2, p. 71, ¶ G. As such, the Court grants summary judgment for Plaintiff on Defendant's counterclaim for Defamation/Slander.

### 4.   Counterclaim Count V - Violation of the Automatic Stay

The Court now turns to the Defendants' counterclaim for violation of the automatic stay. ECF No. 28, pp. 25–26. The Main Bankruptcy Case commenced on January 17, 2022, imposing the automatic stay under 11 U.S.C. § 362(a). *See* ECF No. 1 in Bankruptcy Case No. 22-30072-MVL11 (Bankr. N.D. Tex. Jan. 17, 2022). A suggestion of bankruptcy was provided by e-mail to

the Plaintiff, by and through their counsel on the morning of January 18, 2022. ECF No. 46, p. 50. The final hearing in the Arbitration had been set for that morning at 10:00 a.m.

In an e-mail to PIRTEK's legal counsel that morning, Defendants' legal counsel argued that proceeding with the final hearing of the Arbitration against JBL alone would impact or affect Mr. Lager's bankruptcy estate as he was the sole owner of JBL. *Id.* at 48. Specifically, Defendants' counsel referred the Arbitrator and the Plaintiff to precedent showing that "the automatic stay can apply to non-debtors if the claim against the non-debtor will have an immediate adverse consequence for the debtor's estate." *Id.* at 48 (citing *Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 287 (2d Cir. 2003)). Regardless, PIRTEK decided to press on and pursue the final hearing against JBL. *Id.* at 49.

In its MSJ, Plaintiff argues that its decision to move ahead with the Arbitration against JBL was not a violation of the automatic stay because Mr. Lager only filed bankruptcy for himself as an individual, and JBL was a non-debtor third party entity to which the automatic stay did not extend. ECF No. 38-1, pp. 80–83. However, after having chosen to proceed with the final hearing, Plaintiff argues, out of "an abundance of caution," it asked the Arbitrator not to enter a judgment against JBL. *Id.* at 82. Plaintiff therefore believes that even if it had violated the automatic stay, its violation was not "willful," such that it would be subject to contempt. ECF No. 52, p. 22. Therefore, PIRTEK argues, the Defendants would be unable to show that any damages resulted from the Arbitration hearing which proceeded only against JBL and resulted in no final arbitration award. *Id.* (citing 11 U.S.C. 362(k) (providing that an "***individual***" that is "injured by any willful violation of a stay" ... "shall recover ***actual*** damages")) (emphasis added).

The automatic stay has an "extremely broad" scope. *See In re Chesnut*, 422 F.3d 298, 303 (5th Cir. 2005) (citing 3 COLLIER ON BANKRUPTCY ¶ 362.03 (15th ed. 2003)). The Fifth Circuit

has held that, in the face of uncertainty or ambiguity, courts should presume protection of property that is "arguably" property of the estate, so that it is subject to the process requirements of the automatic stay. *Id.* However, the Fifth Circuit notes that "not every bankruptcy petition, with an attendant claim of a right in property, will transform what is obviously not property of the estate into arguable property that is subject to process requirements." *Id.* at 306.

For Plaintiff to prove that it is entitled to summary judgment on the Defendants' counterclaim, Plaintiff must show there is no issue of material fact as to whether the automatic stay had been violated. At this stage, "facts must be viewed in the light most favorable to the nonmoving party." *Scott v. Harris*, 550 U.S. 372, 378 (2007). In *Chesnut*, the Fifth Circuit noted that there are three elements to a claim for violation of the automatic stay: (1) the defendant must have known of the existence of the automatic stay; (2) the defendant's acts must have been intentional; and (3) these acts must have violated the stay. 422 F.3d at 302. The Court will note that there is no dispute that Plaintiff knew that the stay was in effect as to Mr. Lager and his property, yet still chose to pursue its action against JBL in the Arbitration. *See* ECF No. 46, p. 45; ECF No. 38-2, pp. 14–15, ¶¶ 35–36. Here, as in *Chesnut*, the question that persists is whether Mr. Lager's interest in JBL, itself a non-debtor third party, would be considered arguable property subject to the automatic stay's process requirements.

The Defendants argue that summary judgment should be denied on Defendants' counterclaim for violation of 11 U.S.C. § 362(a)(3) because the evidence shows that PIRTEK continued the Arbitration in a clear effort to exercise control over property of the bankruptcy estate. *See* ECF No. 45, p. 22. Specifically, the Defendant points out that following the filing of the Main Bankruptcy Case, PIRTEK sought to use the Arbitration Award to enforce a non-competition clause contained within the remedies section of the Second Settlement, which would curtail JBL's

continued operations and eradicate Mr. Lager's sole source of income. *See* ECF No. 45, p. 22, n. 8; *see also* ECF No. 46, p. 134 ("[W]ithin 60 days of this Award, Texas Hose Pro and JB Hose shall terminate operations of any business that competes with PIRTEK.").

Defendants cite to *In re Johnson*, a case from the United States Bankruptcy Court for the Southern District of Ohio, which stands for the proposition that "it is well recognized that actions against non-debtors that would have an 'adverse impact' upon the property of the estate are subject to the automatic stay under § 362(a)(3)." 548 B.R. 770, 790 (Bankr. S.D. Ohio 2016). In the *Johnson* case, a professional hockey player's rights in his employment contract and his derivative claims against a creditor with whom he was involved in a prepetition arbitration proceeding were considered property of the estate because they constituted a "contingent interest in future income." *Id.* at 791. As such, the *Johnson* court ruled that an arbitration award, issued post-petition, that found that the creditor had a perfected security interest in the player's employment contract violated the automatic stay under section 362(a)(3). *Id.* at 793.

Based on its review of the arguments advanced by the parties and the summary judgment record, the Court finds that there remains a material issue of fact for trial as to whether the automatic stay was violated by the Plaintiff's choice to pursue a final hearing in the Arbitration after being provided a suggestion of bankruptcy for Mr. Lager. Thus, the Court will deny summary judgment on Defendants' counterclaim Count V for violation of the automatic stay.

### 5.   Counterclaim Count VI – Objection to Claims and Right to Setoff

Plaintiff also seeks summary judgment on Defendants' final counterclaim for "Objection to Claims and Right to Setoff." ECF No. 38-1, pp. 83–84. Plaintiff argues that Defendants improperly pled setoff as a counterclaim when it should have been asserted as an affirmative defense. *Id.* at 83. Further, the Plaintiff believes that it is entitled to summary judgment on

Defendants' counterclaim for setoff because "Plaintiff is entitled to summary judgment on Defendants' five substantive causes of action and therefore PIRTEK does not owe Defendants any money." *Id.* However, as the Court has denied summary judgment on Defendants' counterclaim Count V, Plaintiff's presupposition of its success is a bit presumptive.

Section 553(a) of the Bankruptcy Code governs setoff in bankruptcy but does not grant the right to setoff; it merely preserves the right under applicable non-bankruptcy law. *See Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 18 (1995). Setoff has been considered *either* an affirmative defense *or* an equitable counterclaim under Texas law that must be pleaded and proved by the party asserting it. *See In re Levenson Group, Inc.*, No. 20-03027, 2022 WL 1241432, at *9 (Bankr. N.D. Tex. Apr. 27, 2022); *see also Capital Concepts Properties 85-1 v. Mutual First, Inc.*, 35 F.3d 170, 175 (5th Cir. 1994) (citing to 67 TEX. JUR. 3d § 3 *Setoffs, Counterclaims, and Cross Actions* (1989)). Likewise, federal courts have held that setoff may be pled "as either a counterclaim or an affirmative defense" when the right arises under federal law. *In re Nasr*, 120 B.R. 855, 857 (Bankr. S.D. Tex. 1990); *see also Health Republic Insurance Company v. United States*, 150 Fed. Cl. 233, 237 (Fed. Cl. 2020) ("the government may not unduly delay raising a setoff defense or asserting a counterclaim for setoff."). As such, the Court finds that whether setoff is pled as an affirmative defense or as a counterclaim is largely a distinction without a difference in the instant case and certainly not sufficient grounds for the court to grant summary judgment thereon.

The purpose of setoff is "to adjust the demands between the parties and allow recovery of only the balance that is due." *See Cap. Concepts*, 35 F.3d at 175 (quoting *Anderson v. Vinson Expl. Inc.*, 832 S.W.2d 657, 666 (Tex. App. –El Paso 1992, writ denied)). Setoff is only permitted "where demands are mutual, between the same parties, and in the same capacity or right." *Id.* The Court notes that PIRTEK's final argument against the Defendants' counterclaim for setoff is premised

on its presupposition of success against each of the Defendants' five other counterclaims. PIRTEK has proven that it is entitled to summary judgment on four of those counterclaims, but the Court has denied summary judgment as to whether the automatic stay was violated by the Plaintiff. As such, the Defendants will have the opportunity to prove whether they are entitled to any amount in recovery at trial. Therefore, the Court denies Plaintiff's request for summary judgment on Count VI of the Defendants' counterclaims.

## V. C̲O̲N̲C̲L̲U̲S̲I̲O̲N̲.

In conclusion, the Court **GRANTS** the Plaintiff's MSJ with respect to Counts I, II, and III of its Amended Complaint. The Court also **GRANTS** Plaintiff's request for summary judgment awarding the liquidated damages in the amount of $453,000.00 in accordance with the terms of the Second Settlement, but the Court **DENIES** the Plaintiff's request for summary judgment on the attorney's fees and costs it claims in association with the Arbitration because the Plaintiff has failed to meet its burden of proof thereon. The Court will further **GRANT** Plaintiff's request for a permanent injunction in this case, barring the Defendants from further breaches of the terms of the Second Settlement, as particularly set forth herein. The Court also **GRANTS** summary judgment on each of the Defendants' affirmative defenses and Defendants' Counterclaims Counts I through IV but **DENIES** summary judgment on Counterclaim Counts V and VI. Finally, the Court hereby dismisses each of the Defendants' affirmative defenses and Counterclaim Counts I through IV for failure to state a claim on which relief may be granted. For the foregoing reasons, the Court hereby **GRANTS** the Plaintiff's Motion for Summary Judgment in part, and also **DENIES** it, in part.

**IT IS SO ORDERED.**

**### END OF MEMORANDUM OPINION AND ORDER ###**